```
_____ FILED    _____ LODGED
              _____ RECEIVED

       JUL 12 2016

     CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                         DEPUTY
```

# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL SETH FRANEY,<br><br>Defendant. | NO. CR16-5073<br><br>**PLEA AGREEMENT** |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Todd Greenberg, Assistant United States Attorney for said District, Defendant, Daniel Seth Franey, and his attorneys, Linda R. Sullivan and Mohammad Hamoudi, enter into the following Agreement, pursuant to Federal Rule of Criminal Procedure 11(c):

1.      **The Charge.** Defendant, having been advised of the right to have this matter tried before a jury, agrees to waive that right and enter a plea of guilty to the charge of Unlawful Possession of Machineguns, in violation of Title 18, United States Code, Section 922(o), as charged in Count 5 of the Indictment.

By entering a plea of guilty, Defendant hereby waives all objections to the form of the charging document. Defendant further understands that, before entering his guilty

plea, he will be placed under oath. Any statement given by Defendant under oath may be used by the United States in a prosecution for perjury or false statement.

2. **Elements of the Offense.** The elements of the offense of Unlawful Possession of Machineguns, in violation of Title 18, United States Code, Section 922(o), as charged in Count 5 of the Indictment, as to which Defendant is pleading guilty, are as follows:

    a. First, the Defendant knowingly possessed a firearm; and

    b. Second, the firearm was a "machinegun," as defined in Title 18, United States Code, Section 921(a)(23), and Title 26, United States Code, Section 5845(b), that is, a weapon which shoots and is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

3. **The Penalties.** Defendant understands that the statutory penalties applicable to the offense of Unlawful Possession of Machineguns, in violation of Title 18, United States Code, Section 922(o), as charged in Count 5 of the Indictment, are as follows: a maximum term of imprisonment of up to ten (10) years, a fine of up to two hundred and fifty thousand dollars ($250,000), a period of supervision following release from prison of up to three (3) years, and a mandatory special assessment of one hundred dollars ($100). If a probationary sentence is imposed, the probation period can be for up to five (5) years. Defendant agrees that the special assessment shall be paid at or before the time of sentencing.

Defendant understands that supervised release is a period of time following imprisonment during which he will be subject to certain restrictive conditions and requirements. Defendant further understands that, if supervised release is imposed and he violates one or more of the conditions or requirements, Defendant could be returned to prison for all or part of the term of supervised release that was originally imposed. This could result in Defendant serving a total term of imprisonment greater than the statutory maximum stated above.

PLEA AGREEMENT/FRANEY - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Defendant understands that, as a part of any sentence, in addition to any term of imprisonment and/or fine that is imposed, the Court may order Defendant to pay restitution to any victim of the offense, as required by law. Defendant further understands that the consequences of pleading guilty may include the forfeiture of certain property, either as a part of the sentence imposed by the Court, or as a result of civil judicial or administrative process.

Defendant agrees that any monetary penalty the Court imposes, including the special assessment, fine, costs, or restitution, is due and payable immediately and further agrees to submit a completed Financial Statement of Debtor form as requested by the United States Attorney's Office.

4. **Rights Waived by Pleading Guilty.** Defendant understands that, by pleading guilty, he knowingly and voluntarily waives the following rights:

    a. The right to plead not guilty and to persist in a plea of not guilty;

    b. The right to a speedy and public trial before a jury of his peers;

    c. The right to the effective assistance of counsel at trial, including, if Defendant could not afford an attorney, the right to have the Court appoint one for him;

    d. The right to be presumed innocent until guilt has been established beyond a reasonable doubt at trial;

    e. The right to confront and cross-examine witnesses against Defendant at trial;

    f. The right to compel or subpoena witnesses to appear on his behalf at trial;

    g. The right to testify or to remain silent at trial, at which trial such silence could not be used against Defendant; and

    h. The right to appeal a finding of guilt or any pretrial rulings.

//
//

5. **United States Sentencing Guidelines**. Defendant understands and acknowledges that the Court must consider the sentencing range calculated under the United States Sentencing Guidelines and possible departures under the Sentencing Guidelines together with the other factors set forth in Title 18, United States Code, Section 3553(a), including: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need for the sentence to afford adequate deterrence to criminal conduct; (5) the need for the sentence to protect the public from further crimes of the defendant; (6) the need to provide the defendant with educational and vocational training, medical care, or other correctional treatment in the most effective manner; (7) the kinds of sentences available; (8) the need to provide restitution to victims; and (9) the need to avoid unwarranted sentence disparity among defendants involved in similar conduct who have similar records. Accordingly, Defendant understands and acknowledges that:

    a. The Court will determine Defendant's Sentencing Guidelines range at the time of sentencing;

    b. After consideration of the Sentencing Guidelines and the factors in 18 U.S.C. 3553(a), the Court may impose any sentence authorized by law, up to the maximum term authorized by law;

    c. The Court is not bound by any recommendation regarding the sentence to be imposed, or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Department, or by any stipulations or agreements between the parties in this Plea Agreement; and

    d. Defendant may not withdraw his guilty plea solely because of the sentence imposed by the Court.

6. **Ultimate Sentence**. Defendant acknowledges that no one has promised or guaranteed what sentence the Court will impose.

7. **Statement of Facts**. The parties agree on the following facts. Defendant admits he is guilty of the charged offense:

a. Between July 2, 2015, and January 30, 2016, Daniel Seth Franey had numerous in person meetings and telephonic contacts with an undercover law enforcement officer ("UC1"). Over time, UC1 revealed to Franey that he was an unlawful black market seller of firearms. Franey ultimately joined UC1 on five staged firearms trafficking delivery trips. Franey acted as a lookout during these trips, and also personally handled firearms on multiple occasions. From time to time, other undercover officers also participated in meetings with Franey, often posing as UC1's gun trafficking associates and/or customers who purchased the firearms.

b. On August 3-4, 2015, Franey joined UC1 on a thirteen-hour "delivery" trip to and from Spokane, Washington. Towards the beginning of the trip, Franey told UC1 that he "fantasized" that UC1 was a "small arms dealer" because "we need some small arms." UC1 drove to a store in Tukwila, Washington and parked in the lot. At that point, another undercover officer delivered to UC1 a bag containing several firearms, including Colt AR-15 assault rifles, Colt M16 assault rifles, Glock pistols, and a Smith & Wesson pistol. UC1 then drove along with Franey to Spokane, where they parked in the lot of a hotel. UC1 and Franey entered the lobby of the hotel, with UC1 carrying the bag of firearms. Franey remained in the lobby while UC1 went into one of the hotel rooms to "deliver" the firearms to his "customers." UC1 then returned to the lobby, reunited with Franey, and they returned to UC1's vehicle. UC1 paid Franey cash for his assistance during this trip.

c. On September 1-2, 2015, Franey joined UC1 on an overnight "delivery" trip to and from Spokane. Franey again participated in the role of a "lookout" on this trip. UC1 drove to a store in Tukwila, Washington, and parked in the lot. UC1 entered the store, while Franey remained in the vehicle. UC1 returned to the vehicle with a bag of firearms that he had received from another undercover officer. UC1 asked Franey to look in the bag to see what was in there. Franey looked in the bag and stated, "Seven ARs and four handguns." Franey and UC1 then discussed a variety of different types of firearms and Franey expressed his preference for AK-47s and other types of assault rifles. When UC1 and Franey arrived in Spokane, UC1 parked at a hotel parking lot and went inside the lobby for the "firearms exchange." Franey acted as a lookout, staying in the vehicle. When UC1 returned, he paid Franey cash for his participation on the trip.

d. On September 28, 2015, Franey joined UC1 on a twelve-hour trip to and from Ellensburg, Washington, with the understanding that he was assisting as a lookout while UC1 was delivering firearms to another customer. That morning, UC1 and Franey arrived at a store in Tukwila, Washington. UC1 parked his vehicle in the parking

lot. A few moments later, another undercover officer entered the rear seat of UC1's vehicle, and delivered a duffel bag containing several .40 caliber handguns. The undercover officer unzipped the bag, while Franey and UC1 turned around and watched from the front seats. Franey asked if there were "a dozen handguns." UC1 removed a Glock Model 22 .40 caliber pistol (serial number KMD480) from the bag and handed it to Franey. Franey took possession of the Glock 22 and handled it for a few minutes. UC1 then removed a Glock Model 23 .40 caliber pistol (serial number KHZ682) from the bag and handed it to Franey, who took possession of it, handled and inspected it, and then returned it to UC1, who placed it into the bag and zipped the bag closed. During this conversation, Franey stated, "It would be nice to have a handgun." When they arrived in Ellensburg, UC1 parked in the lot of a hotel. UC1 and Franey entered the lobby of the hotel. Franey stayed in the lobby while UC1 delivered the bag of guns to another undercover officer in a hotel room. After the delivery, UC1 and Franey got back into UC1's vehicle. UC1 paid Franey cash for his participation in the "delivery."

        e.      On October 26-29, 2015, Franey joined UC1 on a four-day "delivery" trip to and from Santa Monica, California. Franey again agreed to assist in the role of a "lookout" on this trip. On October 26, 2015, Franey met UC1 in Olympia, Washington. Franey entered UC1's vehicle and they began driving south on Interstate-5. Prior to meeting with Franey, UC1 placed a duffel bag of firearms on the back rear floorboard of the vehicle. Among other firearms, the bag contained a fully automatic AK-47 style Romarm-Cugir Model PM-65 7.62 x 39 mm assault rifle (serial number 1979- ZG3795). UC1 commented that Franey would like one of the firearms in the bag, and told Franey that he could look at them. Franey turned around in his seat, reached out to the duffel bag, and unzipped it. Franey removed the above-referenced AK-47. As Franey held the gun, he manipulated the collapsible stock and made various comments about the firearm. Franey then returned the AK-47 back to the bag and zipped it closed. UC1 explained that the firearm could be switched between fully automatic and semi-automatic. Franey replied, "The selector switch, yeah. That'd be nice to have as an option." The next day, on October 27, 2015, in Santa Monica, UC1 sold the bag of firearms to other undercover officers, in Franey's presence. One of the other undercover officers asked Franey whether he "did anything wrong today" by delivering the firearms. Franey responded that "in the government's opinion" he did do something wrong because "I know I can't have 'em," referring to the fact that he was not lawfully allowed to possess firearms.

        f.      On November 12-13, 2015, Franey and UC1 went on an overnight delivery trip to Yakima County, Washington. The trip started on November 12, 2015, when Franey met UC1 in the parking lot of a store in Lacey, Washington. They then drove to the Yakima area in UC1's vehicle. Prior to meeting with Franey, UC1 had placed a duffel bag containing several firearms on the rear floorboard of his vehicle.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Included amongst the various firearms were a fully automatic Colt Model AR-15 5.56 mm assault rifle (serial number 4378629) and a fully automatic AK-47 style Romarm-Cugir Model PM-65 7.62 x 39 mm assault rifle (serial number 1979-ZG2045). While driving southbound on Interstate-5, UC1 and Franey began discussing the firearms that were in the bag. UC1 told Franey there was an AR-15 and an AK-47 that Franey could shoot later that day if he wanted to. Franey responded, "Okay." Franey turned around, reached into the back seat area, and began unzipping the bag. Franey then took possession of the AK-47. As Franey handled the AK-47, he and UC1 discussed that the AK-47 was capable of firing either fully-automatic or semi-automatic. Franey moved the selector switch through the various available positions (fully-automatic, semi-automatic, and safe). Franey then placed the AK-47 back in the bag and zipped it closed.

    g.  Later on November 12, 2015, UC1 and Franey arrived at a campground in Naches, Washington, where they met with other undercover officers who were posing as UC1's customers. They drove to a nearby clearing, where UC1 removed the bag of firearms from his vehicle, and placed it on the tailgate area of the vehicle. One of the UCs removed the AR-15 assault rifle (serial number 4378629) from the bag, loaded it with ammunition, and began firing it. Franey was standing nearby and was watching. One of the UCs then asked Franey whether he wanted to fire the AR-15. Franey took possession of the AR-15 and fired it several times. A few minutes later, UC1 provided Franey with the AK-47 (serial number ZG2045), and Franey fired it in the fully automatic mode. UC1 then approached Franey to take back the AK-47, but Franey asked to shoot it in the semi-automatic mode. The UCs explained to Franey how he could transition the AK-47 to fire semi-automatic, and Franey then manipulated the selector switch and fired the rifle in the semi-automatic mode. Franey then provided the AK-47 to UC1, who secured all of the firearms back in the bag and returned the bag to his vehicle. Franey, UC1, and the other UCs then drove back to the campground, where they spent the night. UC1 "sold" the AK-47 and the AR-15 firearms to the other undercover officers, in Franey's presence. UC1 paid Franey cash for his participation on this "delivery" trip.

    h.  After the firearms delivery trip on November 12-13, 2015, Franey continued to have contacts with UC1 and other undercover officers, including multiple in-person meetings, phone calls, and text message exchanges. Throughout his interactions with UC1, Franey repeatedly requested and often demanded to purchase from UC1 various types of firearms for himself, including assault rifles and handguns. On January 29, 2016, Franey ordered from UC1 a Street Sweeper shotgun and an AR-15 assault rifle, along with magazines and ammunition, for a total price of $1,900. The following day, Franey asked UC1 to cancel the order because he did not have the "budget" at that time to make the purchase, although Franey also invited UC1 to "swing by and donate" the firearms to him as charity.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

i. During his interactions with UC1, Franey consistently discussed his support for the organization known as the Islamic States of Iraq and the Levant (also known as the "Islamic State," "ISIL," and "ISIS"), and discussed wanting to use firearms for various purposes, including shooting any law enforcement officers who responded to his home and attacking a military facility.

j. The above-referenced AK-47 and AR-15 assault rifles are "machineguns," because they were capable of shooting automatically more than one shot, without manual reloading, by a single function of the trigger. Franey is not legally entitled to possess firearms based on a Protection Order entered in the Nineteenth Judicial Circuit Court of Lake County, Illinois, in the case of *Amanda Kienast v. Daniel Franey*, case number 140P381. The Court in that matter, on May 5, 2014, issued an Order of Protection against Franey that meets all of the requirements set forth in 18 U.S.C. § 922(g)(8)(A)-(C), and therefore prohibits Franey from possessing a firearm under federal law. Specifically, the court documents establish that, as required by § 922(g)(8), Franey received advanced notice of the hearing via personal service; the Order of Protection restrains Franey from harassing, threatening, and stalking his former intimate partner (his former live-in partner who is also the mother of Franey's children); and the Order prohibits the use and threatened use of physical harm and bodily injury against the former intimate partner and the children.

k. The parties agree that the Court may consider additional facts contained in the Presentence Report (subject to standard objections by the parties) and/or that may be presented by the United States or Defendant at the time of sentencing, and that the factual statement contained herein is not intended to limit the facts that the parties may present to the Court at the time of sentencing.

8. **Sentencing Factors**. The parties agree that the following Sentencing Guidelines provisions apply to this case:

A base offense level of 20, pursuant to USSG § 2K2.1(a)(4)(A), because Defendant was a prohibited person at the time of the offense and the offense involved a machinegun;

A two-level upward adjustment, pursuant to USSG § 2K2.1(b)(1)(A), because the offense and relevant conduct thereto involved five firearms;

The United States acknowledges that if Defendant qualifies for an acceptance of responsibility adjustment pursuant to USSG § 3E1.1(a), and if the offense level is sixteen (16) or greater, his total offense level should be decreased by three (3) levels pursuant to USSG § 3E1.1(a) and (b), because he has assisted the United States by timely notifying the authorities

of Defendant's intention to plead guilty, thereby permitting the United States to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

The parties agree they are free to present arguments regarding the applicability of all other provisions of the United States Sentencing Guidelines, with the exception that the government agrees not to advocate for the application of an upward adjustment under USSG § 3A1.4. Defendant understands, however, that at the time of sentencing, the Court is free to reject these stipulated adjustments, and is further free to apply additional downward or upward adjustments in determining Defendant's Sentencing Guidelines range.

9. **Non-Prosecution of Additional Offenses.** As part of this Plea Agreement, the United States Attorney's Office for the Western District of Washington and the United States Attorney's Office for the Eastern District of Washington agree not to prosecute Defendant for any additional offenses known to it as of the time of this Agreement that are based upon evidence in its possession at this time, and that arise out of the conduct giving rise to this investigation. In addition, the United States Attorney's Office for the Western District of Washington agrees to dismiss Counts 1-4 of the Indictment at the time of sentencing.

In this regard, Defendant recognizes the United States may have agreed not to prosecute all of the criminal charges the evidence establishes were committed by Defendant solely because of the promises made by Defendant in this Agreement. Defendant agrees, however, that for purposes of preparing the Presentence Report, the United States Attorney's Office will provide the United States Probation Office with evidence of all conduct committed by Defendant.

Defendant agrees that any charges to be dismissed before or at the time of sentencing were substantially justified in light of the evidence available to the United States, were not vexatious, frivolous or taken in bad faith, and do not provide Defendant

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

with a basis for any future claims under the "Hyde Amendment," Pub. L. No. 105-119 (1997).

10. **Forfeiture of Contraband.** Defendant also agrees that if any law enforcement agency seized any firearms or other illegal contraband that was in Defendant's direct or indirect control, Defendant consents to the administrative forfeiture, official use, and/or destruction of said firearms or contraband by any law enforcement agency involved in the seizure of these items.

11. **Breach, Waiver, and Post-Plea Conduct.** Defendant agrees that, if Defendant breaches this Plea Agreement, the United States may withdraw from this Plea Agreement and Defendant may be prosecuted for all offenses for which the United States has evidence. Defendant agrees not to oppose any steps taken by the United States to nullify this Plea Agreement, including the filing of a motion to withdraw from the Plea Agreement. Defendant also agrees that, if Defendant is in breach of this Plea Agreement, Defendant has waived any objection to the re-institution of any charges in the Indictment that were previously dismissed and any additional charges that had not been prosecuted.

Defendant further understands that if, after the date of this Agreement, Defendant should engage in illegal conduct, or conduct that violates any conditions of release or the conditions of his confinement, (examples of which include, but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the Pretrial Services Officer, Probation Officer, or Court), the United States is free under this Agreement to file additional charges against Defendant or to seek a sentence that takes such conduct into consideration by requesting the Court to apply additional adjustments or enhancements in its Sentencing Guidelines calculations in order to increase the applicable advisory Guidelines range, and/or by seeking an upward departure or variance from the calculated advisory Guidelines range. Under these circumstances, the United States is free to seek such adjustments, enhancements, departures, and/or variances even if otherwise precluded by the terms of the plea agreement.

PLEA AGREEMENT/FRANEY - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

12. **Voluntariness of Plea.** Defendant agrees that he has entered into this Plea Agreement freely and voluntarily and that no threats or promises, other than the promises contained in this Plea Agreement, were made to induce Defendant to enter his plea of guilty.

13. **Statute of Limitations.** In the event this Agreement is not accepted by the Court for any reason, or Defendant has breached any of the terms of this Plea Agreement, the statute of limitations shall be deemed to have been tolled from the date of the Plea Agreement to: (1) thirty (30) days following the date of non-acceptance of the Plea Agreement by the Court; or (2) thirty (30) days following the date on which a breach of the Plea Agreement by Defendant is discovered by the United States Attorney's Office.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

14.     **Completeness of Agreement.** The United States and Defendant acknowledge that these terms constitute the entire Plea Agreement between the parties. This Agreement binds only the United States Attorney's Office for the Western District of Washington and the United States Attorney's Office for the Eastern District of Washington. It does not bind any other United States Attorney's Office or any other office or agency of the United States, or any state or local prosecutor.

Dated this day of July, 2016.

_____
DANIEL SETH FRANEY
Defendant

_____
LINDA R. SULLIVAN
Attorney for Defendant

_____
MOHAMMAD HAMOUDI
Attorney for Defendant

_____
TODD GREENBERG
Assistant United States Attorney