**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**IN TACOMA**

---

UNITED STATES OF AMERICA,   )
                            )
            Plaintiff,      )   No. CR16-5073RBL
                            )
        vs.                 )
                            )
DANIEL SETH FRANEY,         )
                            )
            Defendant.      )

---

**PLEA HEARING**

---

**BEFORE THE HONORABLE RONALD B. LEIGHTON**
**UNITED STATES DISTRICT COURT JUDGE**

**July 12, 2016**

**APPEARANCES:**

**Todd Greenberg**
**Assistant United States Attorney**
**Representing the Plaintiff**

**Mohammad Hamoudi**
**Linda Sullivan**
**Federal Public Defender's Office**
**Representing the Defendant**

10:38:43AM 1          THE CLERK:  This is in the matter of the United

10:38:45AM 2   States of America versus Daniel Franey,

10:38:50AM 3   Cause No. CR16-5073RBL.  Counsel, please make their

10:38:52AM 4   appearances.

10:38:52AM 5          MR. GREENBERG:  Your Honor, Todd Greenberg for the

10:38:55AM 6   United States.

10:38:55AM 7          THE COURT:  Good morning, Mr. Greenberg.

10:38:58AM 8          MR. HAMOUDI:  Good morning, your Honor.  Mohammad

10:39:01AM 9   Hamoudi from the Federal Defender's Office, and Linda

10:39:02AM 10  Sullivan from the same office, on behalf of Mr. Franey

10:39:06AM 11  today.

10:39:06AM 12         THE COURT:  Good morning, Mr. Hamoudi,

10:39:07AM 13  Ms. Sullivan.  Mr. Franey, good morning.

         14         THE DEFENDANT:  Good morning, sir.

10:39:10AM 15         THE COURT:  This matter is before the court for a

10:39:13AM 16  change of plea.  Mr. Hamoudi, have you had an opportunity

10:39:17AM 17  to review the decision with your client?

10:39:21AM 18         MR. HAMOUDI:  Yes, we have, your Honor.  We are

10:39:22AM 19  ready to proceed.

10:39:23AM 20         THE COURT:  Mr. Franey, are you prepared?

10:39:26AM 21         THE DEFENDANT:  Yes, your Honor.

10:39:32AM 22         THE COURT:  Under these circumstances the court

10:39:34AM 23  has you sworn to give truthful and correct answers under

10:39:38AM 24  oath.  Under certain circumstances, if you do not give

10:39:41AM 25  truthful and correct answers to the court's questions, the

10:39:44AM 1    United States can file perjury charges against you, which

10:39:47AM 2    are separate and apart from the charges you are now

10:39:50AM 3    facing.  Do you have any objection to being sworn?

10:39:53AM 4         THE DEFENDANT:  No.

10:39:54AM 5         THE COURT:  Please stand and raise your right

10:39:57AM 6    hand.  Ms. Boring will administer the oath.

10:40:12AM 7        (At this time the defendant was sworn.)

10:40:12AM 8         THE COURT:  Mr. Greenberg, if you would, tell

10:40:15AM 9    Mr. Franey exactly what he is being charged with, what the

10:40:19AM 10   statutory maximum penalties are, including any mandatory

10:40:22AM 11   minimums, periods of supervised release, fines, and

10:40:25AM 12   special assessments.

10:40:26AM 13        MR. GREENBERG:  Yes, your Honor.  The defendant is

10:40:27AM 14   expected to plead guilty to one count, that is, Count 5 of

10:40:31AM 15   the indictment, which charges the offense of unlawful

10:40:34AM 16   possession of machine guns, in violation of Title 18,

10:40:37AM 17   United States Code, Section 922(o).

10:40:41AM 18      The maximum penalties for that offense are up to ten

10:40:47AM 19   years in prison, a fine of up to $250,000, a period of

10:40:52AM 20   supervised release for up to three years, and a $100

10:40:55AM 21   special assessment.

10:40:57AM 22        THE COURT:  Thank you, Mr. Greenberg.

10:41:00AM 23      Mr. Franey, I want to inform you that if this case

10:41:03AM 24   were to go to trial, the government would have to prove

10:41:06AM 25   the following elements beyond a reasonable doubt before

10:41:08AM 1  you could be convicted of the offense in Count 5:  First,

10:41:15AM 2  the defendant knowingly possessed a firearm; and, second,

10:41:18AM 3  the firearm was a machine gun, as defined in Title 18,

10:41:23AM 4  United States Code, Section 921(a)(23), and Title 26,

10:41:29AM 5  United States Code, Section 5854(b), that is, a weapon

10:41:34AM 6  which shoots and is designed to shoot automatically more

10:41:38AM 7  than one shot, without manually reloading, by a single

10:41:41AM 8  function of the trigger.  Do you understand those

10:41:46AM 9  elements?

10:41:48AM 10        THE DEFENDANT:  Your Honor, would it make a

10:41:50AM 11  difference if I didn't understand that possession of a

10:41:52AM 12  weapon was classified as having access to it or handling

10:41:55AM 13  it?  If possession, in my mind, as I understood it, was

10:41:59AM 14  actually having the gun as yours, would it make a

10:42:03AM 15  difference to you?

10:42:03AM 16        THE COURT:  No.  There is a kerfuffle now about

10:42:09AM 17  intent on everything after Mrs. Clinton's escapade.  If

10:42:19AM 18  you had the power to control it, that's possession.

10:42:26AM 19        THE DEFENDANT:  I didn't know that.  I wouldn't

10:42:32AM 20  have never hung out with them, past them being in my yard,

10:42:36AM 21  if I had known that.  I thought the game was to get me to

10:42:40AM 22  buy the guns.

10:42:41AM 23        MR. HAMOUDI:  Your Honor, I think what he is

10:42:43AM 24  saying is ignorance of the law, which is essentially -- it

10:42:45AM 25  is a maxim of the law, it is not a defense to the charge.

10:42:51AM 1    That's what he is trying to explain.

10:42:51AM 2            THE COURT:  I understand.  I would direct your

10:42:57AM 3    attention to Paragraph 5 of the plea agreement, the

10:43:03AM 4    reference to the United States Sentencing Guidelines.  I

10:43:06AM 5    want to tell you what the process will be from here until

10:43:10AM 6    the day appointed for sentencing.

10:43:16AM 7        You will be interviewed by a member of the Probation

10:43:19AM 8    Office.  They will ask you questions about your personal

10:43:22AM 9    background, your personal history, your criminal history,

10:43:25AM 10   if any.  At the end of the day, they will make a

10:43:32AM 11   recommendation for a sentence that is fair, in their

10:43:39AM 12   minds.  It is not binding on this court.  It is only

10:43:42AM 13   advisory.

10:43:43AM 14       I will review anything that you submit through your

10:43:47AM 15   counsel, and I will review anything the government submits

10:43:53AM 16   on the matter of sentence, what is an appropriate sentence

10:43:58AM 17   under all of the circumstances.

10:44:03AM 18       At the end of the process, I am guided by the nine

10:44:08AM 19   enumerated factors in Paragraph 5.  They are codified in

10:44:12AM 20   Title 18, United States Code, Section 3553(a).  For our

10:44:19AM 21   purposes, you need to know that the court may impose any

10:44:21AM 22   sentence authorized by law, up to the maximum term

10:44:25AM 23   authorized by law.  Do you understand that, sir?

10:44:28AM 24           THE DEFENDANT:  Yes.

10:44:29AM 25           THE COURT:  It is important for us to register

10:44:39AM 1    your answers to the following questions:  Has anyone

10:44:42AM 2    threatened or coerced your family or you to change your

10:44:46AM 3    plea here today?

10:44:48AM 4         THE DEFENDANT:  No.

10:44:53AM 5         THE COURT:  Has anyone told you that they have

10:44:56AM 6    talked to me or any other judge about what sentence you

10:45:00AM 7    will receive in return for your plea of guilty here today?

10:45:03AM 8         THE DEFENDANT:  Definitely not.

10:45:06AM 9         THE COURT:  How old are you, sir?

10:45:07AM 10        THE DEFENDANT:  I am 34 now, sir.

10:45:09AM 11        THE COURT:  How far have you gone in school?

10:45:12AM 12        THE DEFENDANT:  Oh, I got through high school.  I

10:45:14AM 13   intended to go farther, but, you know, life happens.

10:45:18AM 14        THE COURT:  Right.  A common occurrence.  Do you

10:45:23AM 15   think you have sufficient knowledge of our criminal

10:45:27AM 16   justice system to understand the charges against you, with

10:45:34AM 17   the help of your lawyers?

10:45:35AM 18        THE DEFENDANT:  I am getting more educated every

10:45:38AM 19   day.  It is a pretty vast system.  I went over just

10:45:42AM 20   possession laws on the computer there.  It is pretty

10:45:48AM 21   crazy.  In '96 they changed it to, you know, just being

10:45:51AM 22   around it or access to it.  It seems like it is a little

10:45:56AM 23   bit biased or slanted towards being, you know, more useful

10:46:02AM 24   for the government to prosecute, and for a person to be

10:46:07AM 25   considered a criminal.  You know what I mean?

10:46:11AM 1    THE COURT:  Right.

10:46:12AM 2    THE DEFENDANT:  I get that it takes a lot of years

10:46:14AM 3 of schooling, based on what I looked up.  Do you know what

10:46:18AM 4 I mean?

10:46:18AM 5    THE COURT:  Welcome to our world.  It is

10:46:21AM 6 difficult, yeah.

10:46:21AM 7    THE DEFENDANT:  It is frustrating.  I think it is

10:46:24AM 8 unfair for people just like me, but a lot of people.

10:46:28AM 9 Whatever.  I mean, it is what we've got to deal with now.

10:46:31AM 10    THE COURT:  Right.  Do you think you have the

10:46:37AM 11 wherewithal to make the best decision for you under the

10:46:40AM 12 circumstances?

10:46:43AM 13    THE DEFENDANT:  I think when you say someone's

10:46:45AM 14 name versus the United States, that is a lopsided fight.

10:46:48AM 15 I think if I could subpoena the people I know exist, and

10:46:51AM 16 have them come and talk, things would be different, as far

10:46:54AM 17 as the direction it would take.  But I understand probably

10:46:56AM 18 we are not going to be able to get those people, and so

10:46:59AM 19 this is the best route.

10:47:00AM 20    THE COURT:  All right.  Have you ever had a head

10:47:04AM 21 injury or other reason to see a psychiatrist or

10:47:06AM 22 psychologist?

10:47:07AM 23    THE DEFENDANT:  I played a lot of football for

10:47:11AM 24 like nine years.  I was a linebacker and a fullback.

10:47:14AM 25 There was a lot of head-butting going on.  I am also

10:47:19AM 1    probably bipolar.  I did a little bit of boxing.  I don't

10:47:29AM 2    know.  I might have some kind of factors to my --  But I

10:47:34AM 3    feel fine, I guess.

10:47:36AM 4          THE COURT:  Are you oriented as to time and place?

10:47:38AM 5    Do you know you are in a courtroom and why you are here?

10:47:42AM 6          THE DEFENDANT:  I am.  But I was actually locked

10:47:44AM 7    up in a mental hospital, I think, in 2009.  I knew where I

10:47:47AM 8    was.  I knew what time it was.  I knew who my kids were,

10:47:51AM 9    the days they were born.  I answered all the questions

10:47:54AM 10   they had for me.  But they said, you know, "You're crazy."

10:47:57AM 11   I just wanted to go outside, go back to my family, and go

10:48:00AM 12   back to the garden, but they said I wasn't fit.  They said

10:48:03AM 13   I wasn't a danger to myself or anyone else, but I just

10:48:06AM 14   couldn't take care of myself, or whatever.  It is

10:48:08AM 15   different.  I mean, I think I am okay.  But someone else

10:48:12AM 16   might think I am a little off.

10:48:14AM 17         THE COURT:  For our purposes, do you believe you

10:48:18AM 18   understand --

10:48:18AM 19         THE DEFENDANT:  I believe this is the best option,

10:48:20AM 20   I guess, given the circumstances.

10:48:22AM 21         THE COURT:  Okay.  I am going to advise you of

10:48:30AM 22   your rights to a jury trial and all that entails.  The

10:48:36AM 23   charges against you entitle you to a jury trial.  At the

10:48:39AM 24   jury trial the government has the burden to prove you

10:48:42AM 25   guilty beyond a reasonable doubt.  At that jury trial you

10:48:46AM 1   have the presumption of innocence.  The presumption of

10:48:49AM 2   innocence quite literally means that you do not have to do

10:48:53AM 3   anything at trial.  You have no burden of proof or

10:48:55AM 4   disproof.

10:48:57AM 5      You have a right to confront and cross-examine the

10:49:00AM 6   witnesses against you.  If you wish to, you may subpoena

10:49:03AM 7   witnesses to testify on your behalf through the clerk's

10:49:07AM 8   office at no expense to you.  No one can make you take the

10:49:10AM 9   witness stand and testify against yourself, because the

10:49:13AM 10   provisions of the Fifth Amendment to the Constitution of

10:49:16AM 11   the United States affords you that right.

10:49:19AM 12      You do not have to incriminate yourself.  However, if

10:49:22AM 13   you wish to testify, you may do so, and you will be

10:49:25AM 14   treated as any other witness in the case.

10:49:28AM 15      If you proceed to a jury trial, and the jury finds you

10:49:31AM 16   guilty, you have a right to appeal the judgment and

10:49:35AM 17   sentence of the court, and you have a right to a lawyer to

10:49:40AM 18   perfect that appeal, and the right to the transcript of

10:49:42AM 19   that jury trial.  Both will be provided to you at

10:49:45AM 20   government expense.

10:49:47AM 21      If you plead guilty, the right to that jury trial is

10:49:50AM 22   gone forever, but you still have a right to appeal any

10:49:54AM 23   sentence imposed by the court.

10:49:57AM 24      Do you still wish to proceed with a guilty plea today

10:50:01AM 25   to Count 5?

10:50:04AM 1        THE DEFENDANT:  These things that I am waiving,

10:50:05AM 2   these rights I am waiving, I don't waive them very

10:50:08AM 3   lightly.  I don't really like waiving them, to be honest

10:50:11AM 4   with you.

10:50:13AM 5      But the people I know that I could go find, they do

10:50:15AM 6   work for this government.  I don't think we are going to

10:50:20AM 7   be able to get them to come testify.  I know how they are

10:50:26AM 8   going to try and spin it, the proof of these other people

10:50:29AM 9   that are involved.  It is my word against theirs.

10:50:32AM 10      I mean, if I could go out right now and get subpoenas

10:50:36AM 11   and track these people down and say, "Here, sorry, guys,

10:50:39AM 12   you have to come talk about what your involvement was for

10:50:42AM 13   the last five years, and you've got to come tell what

10:50:44AM 14   we" -- "our conversations, what I told you, how I

10:50:46AM 15   responded to you, the requests, and whatnot," you know,

10:50:51AM 16   then I would feel more comfortable going to trial.

10:50:53AM 17      But just -- I am saying all of this just thrown up,

10:50:58AM 18   this is what it is, this is what we think he is, and

10:51:01AM 19   without any proof other than my word, with twelve people I

10:51:05AM 20   don't know, probably different backgrounds, we haven't

10:51:09AM 21   done nearly the same things as these people, sitting on

10:51:11AM 22   the jury, I don't see how they are my peers, I think I am

10:51:15AM 23   probably better off waiving these rights that I don't

10:51:17AM 24   really want to.

10:51:30AM 25        THE COURT:  Thank you.  Mr. Greenberg, tell

10:51:33AM 1    Mr. Franey what the government would be prepared to prove

10:51:36AM 2    if this matter went to a jury trial.

10:51:40AM 3            MR. GREENBERG:  Yes, your Honor.  There is

10:51:42AM 4    obviously a lengthy statement of facts.  If it pleases the

10:51:44AM 5    court, I would just summarize that --

10:51:46AM 6            THE COURT:  That's fine.

10:51:47AM 7            MR. GREENBERG:  -- focusing on the firearms

10:51:49AM 8    possession incidents.

10:51:50AM 9            THE COURT:  That's fine.

10:51:50AM 10           MR. GREENBERG:  The statement of facts sets forth

10:51:52AM 11   that between July 2nd, 2015, and January 30th, 2016, the

10:51:57AM 12   defendant had numerous contacts and meetings with an

10:52:01AM 13   undercover officer, referred to as UC1.  UC1 informed the

10:52:06AM 14   defendant that he was a black market seller of firearms,

10:52:11AM 15   and the defendant joined UC1 on five trips in which the

10:52:16AM 16   undercover was posing to deliver firearms to customers.

10:52:22AM 17       The first trip took place between August 3rd and 4th

10:52:26AM 18   of 2015, where they traveled, the defendant along with the

10:52:31AM 19   undercover, to Spokane, Washington.  The defendant told

10:52:35AM 20   the undercover that he fantasized the undercover was a

10:52:38AM 21   small arms dealer because we needed some small arms.  They

10:52:42AM 22   drove to Tukwila, where they received a bag of firearms,

10:52:46AM 23   and then drove to Spokane where the undercover

10:52:52AM 24   delivered -- was supposed to deliver the bag to his

10:52:54AM 25   customers, with the defendant serving as a lookout during

10:52:58AM 1    the trip.

10:53:00AM 2        The second trip took place on September 1st and 2nd,

10:53:03AM 3    2015.  This was, again, a trip to Spokane for that same

10:53:08AM 4    purpose of delivering a bag of firearms to supposed

10:53:11AM 5    customers.  The defendant again served as a lookout on

10:53:14AM 6    that trip.

10:53:16AM 7        The next trip was September 28th of 2015.  It was a

10:53:20AM 8    12-hour trip to and from Ellensburg, Washington, again,

10:53:24AM 9    for the purpose of the defendant assisting the undercover

10:53:27AM 10   in delivering firearms to customers.  They received the

10:53:31AM 11   firearms outside of a store in Tukwila in a duffel bag

10:53:36AM 12   from another undercover officer.  The defendant asked if

10:53:40AM 13   there were a dozen handguns, and the undercover officer

10:53:44AM 14   removed a Glock model .22 pistol, handed it to the

10:53:47AM 15   defendant, who took possession of it, handled it for a few

10:53:50AM 16   minutes, at which time the defendant then took possession

10:53:55AM 17   of a Glock model .23 caliber pistol, handled it, again

10:54:00AM 18   inspected it, and ultimately returned it to the undercover

10:54:03AM 19   officer.  The defendant also stated it would be nice to

10:54:07AM 20   have a handgun.  They then traveled to Ellensburg, where

10:54:10AM 21   the undercover delivered the firearms with the assistance

10:54:14AM 22   of the defendant.

10:54:16AM 23       The fourth trip was a multi-day trip on October 26th

10:54:20AM 24   through 29th, 2015.  This was to and from Santa Monica,

10:54:25AM 25   California.  The trip started in Olympia, where the

10:54:30AM 1  undercover already had a bag of firearms in his vehicle.

10:54:37AM 2  This bag included a fully automatic AK-47.  The undercover

10:54:44AM 3  told the defendant that he would like one of the guns in

10:54:48AM 4  the bags, and the defendant turned around and removed the

10:54:51AM 5  AK-47 from the bag.  He held the gun, manipulated the

10:54:57AM 6  collapsible stock, and made various comments about the

10:54:59AM 7  gun.  Ultimately, the defendant put the gun back in the

10:55:01AM 8  bag and zipped it closed.  They talked about the selector

10:55:05AM 9  switch on the gun, and the defendant said that would be a

10:55:08AM 10 nice option to have.

10:55:10AM 11     Ultimately, they delivered the bag of firearms to

10:55:13AM 12 other undercover officers in Santa Monica, California, and

10:55:17AM 13 the defendant told one of the undercover officers that he

10:55:20AM 14 can't have them, referring to the fact that he was not

10:55:23AM 15 legally allowed to possess firearms.

10:55:27AM 16     On November 12th through 13th the defendant also went

10:55:31AM 17 with the undercover officer on an overnight trip to Yakima

10:55:37AM 18 County.  It started in Lacey, Washington, where the

10:55:39AM 19 undercover had a duffel bag of firearms in his vehicle

10:55:45AM 20 again, including a fully automatic AR-15 and a fully

10:55:48AM 21 automatic AK-47 assault rifle.

10:55:52AM 22     While they were driving down I-5 they discussed the

10:55:57AM 23 firearms.  The defendant took out of the bag the fully

10:56:01AM 24 automatic AK-47.  He handled it and discussed the fact

10:56:05AM 25 that it was capable of firing both fully automatic and

10:56:08AM 1    semiautomatic.  The defendant manipulated the selector

10:56:12AM 2    switch through the various options available, then

10:56:16AM 3    returned the firearm to the bag.

10:56:19AM 4        Later that afternoon the undercover and the defendant

10:56:23AM 5    arrived at a campground in Naches, Washington, at which

10:56:29AM 6    time, as they had planned, they were test firing some of

10:56:33AM 7    the firearms.  The defendant personally handled and fired

10:56:38AM 8    the fully automatic AR-15, as well as the fully automatic

10:56:47AM 9    AK-47, which was fired in fully automatic mode.  The

10:56:51AM 10   defendant then asked to fire it in semiautomatic mode and

10:56:54AM 11   did that as well.  Ultimately, the undercover took

10:56:57AM 12   possession of the firearms and posed to sell them to the

10:57:02AM 13   other undercover officers who were posing as customers.

10:57:06AM 14       After that, the defendant continued to have contact

10:57:10AM 15   with the undercover officer, requesting and offering to

10:57:14AM 16   buy firearms from the undercover officer.  They had

10:57:18AM 17   reached a deal on January 29th for the defendant to buy a

10:57:22AM 18   Street Sweeper shotgun and an AR-15 assault rifle, along

10:57:28AM 19   with ammunition and magazines, for the price of $1,900.

10:57:32AM 20   But, ultimately, the defendant cancelled that order,

10:57:34AM 21   saying he didn't have the, quote, budget at that time to

10:57:37AM 22   make the purchase, but he invited the undercover to swing

10:57:41AM 23   by and donate the firearms to him for free.

10:57:45AM 24       With respect to the jurisdictional elements of this

10:57:50AM 25   offense, the AK-47 and the AR-15 assault rifles are

10:57:55AM 1   machine guns, as noted, they were fired in a fully

10:57:59AM 2   automatic mode, and they have been inspected by ATF and

10:58:03AM 3   documented as machine guns.

10:58:05AM 4      The defendant is not allowed to possess firearms based

10:58:08AM 5   on a protection order that is entered into the record in a

10:58:12AM 6   case from Lake County, Illinois, that is specified in

10:58:16AM 7   subparagraph J.  That makes the defendant a prohibited

10:58:19AM 8   person.

10:58:21AM 9      The parties have agreed that both sides can present

10:58:24AM 10  additional facts to the court at the time of sentencing.

10:58:29AM 11       THE COURT:  Now, Mr. Franey, have you read the

10:58:34AM 12  statement of facts word by word?

10:58:36AM 13       THE DEFENDANT:  Yes.

10:58:37AM 14       THE COURT:  And you have heard the paraphrasing of

10:58:42AM 15  the recitation of facts from Mr. Greenberg.  Do you agree

10:58:48AM 16  that it is a true statement of what happened?

10:58:51AM 17       THE DEFENDANT:  It is one side of the story,

10:59:01AM 18  summarized in whatever light they want to do that.  To use

10:59:07AM 19  his verbiage, to please the court, I would say it is not

10:59:10AM 20  accurate.  Not just because of my opinion.  We are going

10:59:15AM 21  to do this at sentencing, I understand that.

10:59:19AM 22     For instance, the first page, that he disclosed to me

10:59:21AM 23  he was a small arms dealer, he came to my house and he

10:59:26AM 24  said, "Would you like to go on a trip to California?  You

10:59:29AM 25  can make some money," things like this.  I said, "There is

10:59:32AM 1  a creek down there we grew up fishing.  If you take me

10:59:35AM 2  there, yeah, I would like to go."  And then I questioned

10:59:40AM 3  him more, "Is what we are doing illegal?"  He said, "I

10:59:43AM 4  don't think it is illegal."

10:59:46AM 5      I thought the game, again, was to buy the guns.  So

10:59:50AM 6  when he came to the house, I said, "I'm not going to go."

10:59:54AM 7  He said, "We are not going to California, it is just a

10:59:57AM 8  trip to Spokane and back today."  So I said, "All right, I

11:00:01AM 9  guess I will go."

11:00:02AM 10     When we went, when the other agent jumped in with the

11:00:07AM 11  guns, I knew what the game was.  I thought --  I was

11:00:10AM 12  like --  This is what I expected, you know.  So when we

11:00:13AM 13  went to Spokane, you know, I am already in the car, I

11:00:17AM 14  figure they are not going -- the game was, I thought, to

11:00:21AM 15  buy the guns eventually, right, because they have done

        16  this before.

11:00:25AM 17     We went to Spokane, we come back, he throws me $500.

11:00:29AM 18  That's when I felt a little bit queasy about it.  I said,

11:00:32AM 19  "What's this for?"  He said, "For helping out."  I said,

11:00:34AM 20  "Well, I didn't do anything," and I gave it back to him.

11:00:38AM 21  He pressed me to take it.  I said, "No, I don't feel

11:00:40AM 22  right."  He said, "What about your wife," and all that.

11:00:43AM 23  At the time, we didn't have money even for gas, literally,

11:00:46AM 24  just to tell you where we were at.  They knew this.  They

11:00:50AM 25  also knew I just had a kid.  I am bipolar.  All of these

11:00:53AM 1   things factor into making poor decisions.

11:00:56AM 2       I should have said --  If I would have known the

11:00:58AM 3   possession laws, I wouldn't have gone.  But once I saw

11:01:01AM 4   what was going on, I should have just said, "No, I'm

11:01:04AM 5   good."

11:01:04AM 6       Anyway --  He finally pressed me.  I said, "I will

11:01:06AM 7   take $200," because we need diapers, gas, and a phone

11:01:09AM 8   card.  I said, "Just for that."  I admit I used him to pay

11:01:12AM 9   some bills once in a while, but that was it.

11:01:14AM 10      The trips --  Before the first trip, he said, "I just

11:01:18AM 11  want to hear about Islam."  He knows -- everyone knows I

11:01:21AM 12  like to tell people about Islam.  He said, "You just sit

11:01:24AM 13  in the car on the trip and tell me about Islam, and you'll

11:01:27AM 14  see what I do."  He told me again, like I said, in my

11:01:29AM 15  front yard, that he didn't believe it was illegal.  And I

11:01:33AM 16  believed him to be an agent at the time.

11:01:35AM 17      For him to say it is not illegal, to me, that is not

11:01:38AM 18  what they are trying to get me to do.  They are trying to

11:01:41AM 19  get me to do -- you know, buy the guns.  Right?  So after

11:01:44AM 20  the first trip and the second trip I decided not really to

11:01:49AM 21  go anymore.

11:01:50AM 22      I went --  I know we can get into detail later at

11:01:56AM 23  sentencing.  I know I am pissing Mo off.

11:02:01AM 24      But basically we went to Olympia -- I went to Olympia

11:02:02AM 25  because we were dead broke.  I went to Labor Ready --

11:02:06AM 1  I've never done that in my life, you know.  I've never

11:02:07AM 2  done anything like that.  I worked a shift and came back

11:02:12AM 3  to work the second shift, and I've got a whole procession

11:02:17AM 4  of cop cars and detective cars following me all over

11:02:21AM 5  Olympia.

11:02:22AM 6      I worked my second shift, I get off.  I am giving this

11:02:25AM 7  older gentleman a ride back to his house.  I said, "Oh,

11:02:29AM 8  look at this, man, the cops are following us."  He looks.

11:02:31AM 9  He's like, "Oh, no, it is just a town car," whatever.  And

11:02:36AM 10  then a deputy with his lights come, and another one.  And

11:02:40AM 11  I kind of told him, "This is for me," you know.

11:02:44AM 12      He actually --  He's an older gentleman.  I stopped.

11:02:48AM 13  I kind of told him what was going on.  At the next

11:02:50AM 14  stoplight he jumped out of the car.  I am like, "No, I

11:02:53AM 15  will take you wherever you are going."

11:02:56AM 16      I called my wife, and said, "Hey, I don't know, they

11:02:58AM 17  might arrest me or shoot me today," whatever.  I went back

11:03:00AM 18  to Labor Ready, turned in my paperwork.  The cops sat in

11:03:03AM 19  the parking lot over here, and there was another one over

11:03:05AM 20  here.

11:03:06AM 21      I went up to the window and knocked on it.  He was

11:03:08AM 22  like -- he cracked it.  I said, "Hey, man, look, I am

11:03:10AM 23  tired, I have to pray now.  Are you guys going to let me

11:03:13AM 24  go pray?"  And he was just kind of like, "Sure."  I'm

11:03:16AM 25  like, "Whatever."  And so they followed me.  I went and

```
11:03:17AM  1    got diapers, I went and prayed, and I went home.

11:03:21AM  2        This is before the fishing trip, or the trip which is

11:03:23AM  3    the bag of handguns.  He comes to the house.  He was

11:03:25AM  4    always real coy, and I was coy with him, just kind of a

11:03:28AM  5    game.  Obviously, it is serious.

11:03:30AM  6        He comes and I tell him, "Look, man, maybe we

11:03:33AM  7    shouldn't hang out anymore.  I've got people following me

11:03:37AM  8    all over Olympia.  I'm sure you don't need that kind of

11:03:40AM  9    heat," or whatever.  He was like, "Well, I don't feel no

11:03:43AM 10    heat."  I'm like, "Well, I know the FBI has been sitting

11:03:46AM 11    up the road for the last couple of months."  He was like,

11:03:48AM 12    "Are they here now?"  I just looked right at him.  It was

11:03:51AM 13    on my lips, like --

11:03:53AM 14        Anyway, so I just --  I was like, "All right."  To me,

11:03:57AM 15    he still wants to play the game, they are going to pay my

11:04:00AM 16    bills, and it is way less stress than trying to go to

11:04:03AM 17    Olympia and get followed around by cops, to me.  I

11:04:06AM 18    thought, as long as I didn't buy the guns --

11:04:08AM 19        So we didn't start out, "Hey, I am a black market arms

11:04:12AM 20    dealer.  Do you want to come with me?"  It was --  It's

11:04:13AM 21    not --  It was, "I don't think it is illegal.  I just want

11:04:16AM 22    to hear you tell me about Islam."

11:04:18AM 23        And then when he jumps in with the guns --  If I had

11:04:21AM 24    known right then that they could charge me for being next

11:04:23AM 25    to those guns, possession, I would have said, "I'm good,
```

11:04:27AM 1    man.  No."

11:04:27AM 2        Because there was two other dudes that tried to come

11:04:29AM 3    at me before to come get guns, and I said, "No, thank

11:04:33AM 4    you."

11:04:35AM 5        Anyway, it goes like that -- the whole story goes like

11:04:38AM 6    that.  They have their story, I have mine.  The reality

11:04:41AM 7    is, after the last trip, it was just mosque trips.  He

11:04:45AM 8    even said, "These people are so nice, they are so

11:04:47AM 9    peaceful."  I said, "I know.  That's why it bothers me

10    that you guys are bothering them."  I always referred to

11    him as "you guys," the agents.

11:04:53AM 12       Anyway, long story short, I didn't go on any more

11:04:56AM 13   trips because I had money at that time.  Once I was

11:04:59AM 14   working again, I just -- I told them that like dozens of

11:05:04AM 15   times.

11:05:05AM 16           MR. HAMOUDI:  Your Honor, I think what Mr. Franey

11:05:07AM 17   is trying to summarize to the court is that he would like

11:05:10AM 18   to have an opportunity at sentencing to provide additional

11:05:13AM 19   context to these incidences that are just summarized in

11:05:17AM 20   the plea agreement.  I think the court covered that in

11:05:19AM 21   Paragraph K.  If the court could assure him that he will

11:05:22AM 22   be able to tell his side of the story at sentencing, he

11:05:25AM 23   will be assured.

11:05:26AM 24           THE COURT:  Absolutely.  I need to hear more from

11:05:31AM 25   counsel.  Do you believe this is a volitional, voluntary

11:05:38AM  1   statement of the facts that you can rely on as a basis for

11:05:43AM  2   a plea?

11:05:47AM  3          MR. HAMOUDI:  I think that the statement of facts

11:05:48AM  4   here, your Honor, are a summary, and are correct and

11:05:52AM  5   accurate.  So they are a basis.  They provide a factual

11:05:55AM  6   basis.  The gun charge solely requires the court to

11:06:01AM  7   find -- and I think the indictment -- as the indictment --

11:06:04AM  8   just the fact that he agreed that he possessed a machine

11:06:07AM  9   gun and that that machine gun traveled in interstate -- it

11:06:11AM 10   was a machine gun, and traveled in interstate commerce.  I

11:06:15AM 11   don't know if the court needs to make sure that each

11:06:17AM 12   paragraph is accurate --  If the court is getting my

11:06:22AM 13   gist --

11:06:22AM 14          THE COURT:  Right.

11:06:24AM 15          MR. HAMOUDI:  He agrees that he possessed that

11:06:26AM 16   machine gun.  I think he has made that statement to the

11:06:28AM 17   court.

11:06:29AM 18          THE COURT:  We are not going to engage in

11:06:31AM 19   wordsmithing with the statement of facts.  But I want to

11:06:34AM 20   get your assurance and Mr. Franey's assurance that this

11:06:40AM 21   is, in essence, a true story.  It is not a complete story,

11:06:47AM 22   but it is, as it goes, a true story.

11:06:53AM 23          THE DEFENDANT:  Yes.  I know that -- I mean, where

11:06:58AM 24   it says here that he told me he was -- that he eventually,

11:07:04AM 25   you know, exposed himself as a small arms dealer,

11:07:07AM 1    whatever, you know, I think it would be more honest if

11:07:10AM 2    they said he came to the house and said -- I questioned

11:07:13AM 3    him about what he did.  He said, "I don't think it is

11:07:15AM 4    illegal.  I just want you to come tell me about Islam on

11:07:19AM 5    this road trip, and I will take you fishing."  I think it

11:07:23AM 6    would be more honest if they said that, rather than, "Oh,

11:07:25AM 7    he told me he was a small arms dealer," and the guy jumped

11:07:28AM 8    in the truck with him.  I went because we were, you know,

11:07:31AM 9    in dire need and he said he could make money.  You know

10    what I mean?

11:07:33AM 11       After the trip I didn't even want to take the money,

11:07:35AM 12    except we had literally nothing for diapers.  You know

11:07:38AM 13    what I mean?

11:07:39AM 14       Like I said, when I started going to Labor Ready, and

11:07:41AM 15    they've got these cops following me around, it seemed way

11:07:43AM 16    less stressful just to keep hanging around with these

11:07:46AM 17    guys, because I thought the game was to buy the guns.

11:07:49AM 18       I mean, yeah, this stuff happened.  I can't deny that.

11:07:51AM 19    There is no way.  How it happened, or my motives, their

11:07:56AM 20    motives, it is not portrayed, I don't think, by the

11:08:00AM 21    statement.  But this stuff happened.  Yeah, sure, it

11:08:02AM 22    happened.  Absolutely.

11:08:07AM 23           THE COURT:  All right.  Then --

11:08:10AM 24           THE DEFENDANT:  Sorry.  The last part about when

11:08:12AM 25    we made the arrangement for the deal, I showed them -- I

11:08:19AM 1    pulled out an envelope with $7,000 to prove that it wasn't

11:08:22AM 2    a budget issue, that it was --  "Look, I know what you

11:08:25AM 3    guys are doing.  Leave me alone."

11:08:27AM 4       We took them to the mosque.  We took them to eat.  He

11:08:30AM 5    said, "These people are so amazing, they are so nice."

11:08:31AM 6    The first trip to the mosque he was like -- felt guilty,

11:08:35AM 7    "I can't believe we are bothering these people."  One of

11:08:37AM 8    the brothers gave money so we could take him out to eat.

11:08:41AM 9    He was like, "Why did that guy give that money?"  He is

11:08:43AM 10   like, "He's looking for the word from God," you know.

11:08:46AM 11      Anyway, the idea that it wasn't in the budget, I

11:08:50AM 12   texted him later that it wasn't in the budget, because --

11:08:53AM 13   We played back and forth with texts.  He would question me

11:08:56AM 14   like, "Are you still going to go" --

11:09:18AM 15           MR. HAMOUDI:  Your Honor, the facts are

11:09:20AM 16   volitional.  I can make that representation to the court.

11:09:22AM 17   These are accurate.  We have covered that.  I think what

11:09:27AM 18   we will do is provide additional context at sentencing.

11:09:30AM 19   Okay, your Honor?

11:09:31AM 20           MR. GREENBERG:  Your Honor, we have agreed to

11:09:33AM 21   that, as well.  As the last sentence states, "Both parties

11:09:38AM 22   have the opportunity to provide fuller context."

11:09:41AM 23           THE COURT:  I understand all that.  I have an

11:09:43AM 24   obligation to make sure that Mr. Franey is stating freely

11:09:46AM 25   that he did these things of his own free will, and that

11:09:56AM  1    justifies --  I am not in the habit of convicting an

11:10:02AM  2    innocent man.

11:10:07AM  3            THE DEFENDANT:  What I would suggest --  They are

11:10:09AM  4    agents.  Sometimes they would get upset about it.  There

11:10:11AM  5    is no doubt.  And so I would let it go.  I wish they would

11:10:15AM  6    have just come talk to me before they put him on me --

11:10:18AM  7    about a week before they put him on me.

11:10:19AM  8        Me and my wife were coming home, it was like midnight,

11:10:23AM  9    from Olympia.  It was during Ramadan.  She wanted to get

11:10:27AM 10    some fries -- some sea salt fresh-cut fries from Wendy's

11:10:30AM 11    for the kids and her to snack on on the way home.  And we

11:10:33AM 12    had someone following us from the mosque.  I said, "Look

11:10:36AM 13    at this, man, they've got guys following us."

11:10:37AM 14        I actually pulled into the thing.  I said, "Oh, man,"

11:10:38AM 15    and I put it in park, I got out, and I went back there to

11:10:42AM 16    talk to them.  I'm like, "Hey, I want to talk to you."

11:10:43AM 17    And they are like, "Oh" -- like this, and they got me out

11:10:43AM 18    of there.  I said, "I want to talk to you."  Every time we

11:10:46AM 19    would go to the mosque, I would always talk to them and

11:10:47AM 20    tell them to leave people alone, you know.  And they

11:10:50AM 21    couldn't come talk to me.  You know what I mean?

11:10:52AM 22        I went and tried to talk to this guy following us,

11:10:55AM 23    "Hey, come talk to me," you know.

11:11:00AM 24        All right.  All right.  Sorry.  Anyway, the idea that

11:11:02AM 25    I said it wasn't in the budget was in the text message.

11:11:05AM  1    Standing in front of him, I pulled out the envelope and

11:11:09AM  2    said, "I've the money right here."  He was saying, "Let me

11:11:11AM  3    just put them in your trunk, put them under a pillow."  I

11:11:14AM  4    said, "No, I don't want them."

11:11:15AM  5        I mean, I told him, "Come back later with a different

11:11:17AM  6    car," or whatever, "and I will get paid," whatever.  I

11:11:18AM  7    figured he got the point.  He's not an idiot.  I am not

11:11:18AM  8    going to take them, whatever.  He wasn't that, you know,

11:11:23AM  9    dumb.

11:11:24AM 10        Long story short, on the 3rd of February is when they

11:11:27AM 11    talked to a brother, and the brother told him, "He knows

11:11:30AM 12    you guys are feds."  That's when they came and kicked in

11:11:33AM 13    my door.  It was out of vindictiveness and maliciousness,

11:11:36AM 14    and not because they thought it was anything else.  They

11:11:38AM 15    were upset for spending time and money on me that I did

11:11:41AM 16    not ask them to spend on me.

11:11:43AM 17        I just want to go back to my family.  I am just a

11:11:45AM 18    little bit irritated.  I'm sorry.

11:11:52AM 19            THE COURT:  I am going to ask you what your plea

11:11:54AM 20    is.  What is your plea to Count 5, guilty or not guilty?

11:12:03AM 21            THE DEFENDANT:  Based on the possession laws of

11:12:07AM 22    firearms, I possessed firearms.  I am guilty.

11:12:16AM 23            THE COURT:  Mr. Franey, I find that you have

11:12:19AM 24    knowingly and intelligently waived your right to a jury

11:12:22AM 25    trial, and that you know your rights to appeal, and you

11:12:27AM 1    know the maximum possible punishments.

11:12:30AM 2        I am not as certain that I find that there is a

11:12:33AM 3    factual basis for the plea.  It is a close question.  I

11:12:41AM 4    will accept that there is a factual basis for your plea.

11:12:46AM 5        But I am going to --  I am also not an idiot.  You

11:12:54AM 6    confound me in several respects.  And I am just going to

11:13:01AM 7    put it out on the record.  But I will accept the plea --

11:13:08AM 8            THE DEFENDANT:  Do you mind if I ask what you

11:13:10AM 9    mean?

11:13:15AM 10           THE COURT:  You explained all of your actions in

11:13:28AM 11   terms of a game, using someone to help you get money to

11:13:39AM 12   help pay for the diapers and all of that.  This matter has

11:13:45AM 13   been front and center in your life for many months.  I am

11:13:52AM 14   sympathetic.  I remember very distinctly when you were

11:13:58AM 15   here the first time, and you were so concerned about your

11:14:02AM 16   family.

11:14:02AM 17           THE DEFENDANT:  I am concerned about my family.

11:14:04AM 18           THE COURT:  I know.  I know.  But you don't speak

11:14:14AM 19   plain English sometimes.  And that's not a criticism.  I

11:14:21AM 20   would be rambling, too, because I would be -- because of

11:14:27AM 21   the gravity of the situation and your future and all of

11:14:30AM 22   that is at stake.  It puts me in a place where I've got to

11:14:37AM 23   make some tough decisions.  And that's okay.  I wanted the

11:14:43AM 24   job.  It comes with the territory.

11:14:45AM 25       I am just explaining so that the Court of Appeals can

11:14:50AM 1    look at --  I am saying what is on my mind and what is in

11:14:58AM 2    my heart.  If they think I am overstepping my bounds by

11:15:06AM 3    saying that I accept the plea, and you have shown a

11:15:12AM 4    factual basis for it, so be it.  Okay?  That's what I

11:15:19AM 5    wanted to say.  This is not a typical plea agreement

11:15:24AM 6    colloquy.  Okay?

11:15:27AM 7              THE DEFENDANT:  Yes.

11:15:27AM 8              THE COURT:  Everybody is unique.  And that's okay.

11:15:32AM 9    You can be unique.

11:15:36AM 10             THE DEFENDANT:  Language is interesting and

11:15:39AM 11   perspectives are interesting.  I feel confounded by what

11:15:42AM 12   you're saying at this point.

11:15:43AM 13             THE COURT:  All right.  We are going to have a

11:15:52AM 14   reprise at your sentencing, and we will do it all over

11:15:55AM 15   again.

11:15:59AM 16      I had to say the words, "I accept your plea," and I

11:16:03AM 17   will defer on the plea agreement until receipt of the

11:16:06AM 18   presentence report.

11:16:09AM 19      I have an order here for sentencing for October 7th,

11:16:16AM 20   2016, at 10:00 a.m.  Is that convenient for counsel?

11:16:21AM 21             MS. SULLIVAN:  That's fine, your Honor.

11:16:23AM 22             MR. GREENBERG:  Yes, your Honor.

11:16:24AM 23             MR. HAMOUDI:  Your Honor, thank you.

11:16:42AM 24             THE COURT:  Finally, Mr. Franey, there is a plea

11:16:44AM 25   agreement that purports to bear your signature and today's

11:16:50AM 1    date.  Did you sign this in open court, or at least in the

11:16:54AM 2    courthouse, today?

11:16:55AM 3            THE DEFENDANT:  Yes.

11:16:56AM 4            THE COURT:  Regarding the charges in the

11:16:59AM 5    indictment, the fifth count, is this the only plea

11:17:03AM 6    agreement that you have signed with regard to that charge?

11:17:06AM 7            THE DEFENDANT:  Yes.

11:17:08AM 8            THE COURT:  Very well.  Mr. Franey, you will be

11:17:16AM 9    interviewed by the Probation Office.  I hope you will give

11:17:23AM 10   your full cooperation to them so that they can get a

11:17:30AM 11   better understanding of who you are, and we will see you

11:17:37AM 12   on October 7th.  We will continue the discussion.  That's

11:17:45AM 13   the date that you will be sentenced.

11:17:47AM 14           THE DEFENDANT:  That will be the only day between

11:17:49AM 15   now and then?

11:17:51AM 16           THE COURT:  Unless there is some motion or

11:17:53AM 17   something --

11:17:53AM 18           THE DEFENDANT:  Are we allowed the whole day?

11:17:58AM 19           THE COURT:  Not customarily.  I won't make any

11:18:07AM 20   predictions about how long it will take.  My powers of

11:18:17AM 21   prognostication teaches me that that will be a little

11:18:22AM 22   longer than normal.

11:18:25AM 23           THE DEFENDANT:  I tend to be long-winded.  I think

11:18:27AM 24   that goes with bipolar.

11:18:30AM 25           THE COURT:  Maybe I am bipolar, too.

11:18:33AM 1          THE DEFENDANT:  You seem all right.

11:18:34AM 2          THE COURT:  Court is at recess.

3                 (Proceedings adjourned.)

1                   **C E R T I F I C A T E**

2

3

4       I, Barry Fanning, Official Court Reporter for the

5   United States District Court, Western District of

6   Washington, certify that the foregoing is a true and

7   correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11

12   _____

**/s/ Barry Fanning**

13   **Barry Fanning, Court Reporter**

14

15

16

17

18

19

20

21

22

23

24

25