Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR16-5073RBL |
| Plaintiff, | UNITED STATES' |
| v. | SENTENCING MEMORANDUM |
| DANIEL SETH FRANEY, | |
| Defendant. | |

## I.    Introduction.

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Todd Greenberg, Assistant United States Attorney, hereby files this Sentencing Memorandum regarding defendant Daniel Seth Franey.  For the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of imprisonment of 120 months and a term of supervised release of three years, with all of the conditions of supervised release recommended by the Probation Office.

//

//

//

SENTENCING MEMORANDUM - 1
*United States v. Franey*, CR16-5073RBL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Daniel Franey's offense conduct involved his participation in what he believed to be a large-scale firearms trafficking organization.  Franey served as a courier and lookout for an undercover agent who represented himself to be a member of this criminal organization.  Franey personally handled firearms on several occasions, and once test-fired machineguns, despite being prohibited from legally possessing firearms.  Franey's own statements make clear that his motivation in participating in these criminal activities was his desire to obtain firearms for his own use, including powerful assault rifles and machineguns.  Franey told the undercover agent he was having difficulty acquiring firearms from other sources and repeatedly asked the undercover agent to supply him with guns.  Franey did not hide what he intended to do with those firearms – time after time he stated that he wanted to kill law enforcement officers and attack a military facility near his home, all in the name of the terrorist group known as the Islamic States of Iraq and the Levant (also known as the "Islamic State," "ISIL," and "ISIS").

Franey's history and characteristics include a potentially volatile combination of traits that – especially in light of the motives behind Franey's serious offense conduct – raise serious concerns about his future dangerousness:

- he is obsessed with the radical and violent ideology espoused by ISIL;
- he has a documented history of mental illness and previously has been involuntarily committed at a mental institution;
- he is a disaffected former member of the U.S. Armed Forces who left under dishonorable conditions (desertion) and harbors great resentment towards the military;
- he is insistent on illegally obtaining firearms and has a background in firearms training from his time in the military; and
- he has a history of committing domestic violence crimes.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

All of the relevant statutory sentencing factors call for a lengthy sentence in this case, and as a result the government recommends the maximum possible custodial sentence of 120 months.

## II.     The Sentencing Guidelines Calculations.

The government has no objections to the Sentencing Guidelines calculations set forth in the Presentence Report.  We concur that the defendant has an advisory sentencing range of 33-41 months.  For the reasons set forth herein, this range is simply insufficient to fully account for the seriousness of the offense conduct and the future dangerousness of this defendant.

## III.     Factual Background.

The charges in this case arose out of an undercover investigation and Franey's contacts with a specific undercover agent ("UC1").  The investigation also involved a historical review of Franey's behavior in the community and extensive surveillance of Franey (both physical and electronic) when he was not with UC1.  Many of the facts uncovered during this investigation are summarized in two affidavits:

- the affidavit in support of the Criminal Complaint (discussing facts occurring between April 2015 and November 13, 2015); and

- the affidavit in support of search warrants (continuing with facts from late November 2015 through Franey's arrest in early February 2016).

These affidavits are attached hereto as *Exhibit 1* (Complaint) and *Exhibit 2* (Search Affidavit).  Although this Memorandum will reference some of the facts contained in these affidavits, we respectfully encourage the Court to read them in full, in order to gain a more complete understanding of Franey's concerning behavior and dangerous mindset.

### A. Franey's Independent Behavior – Not Involving UC1.

Franey now portrays himself as some sort of harmless blowhard who was tricked into the present charges by the FBI.  However, his independent behavior in the community – separate and apart from his contacts with UC1 – shows Franey's true colors.  In this section of the Memorandum, the government will discuss various aspects

SENTENCING MEMORANDUM - 3
*United States v. Franey*, CR16-5073RBL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of Franey's independent conduct that have no connection to the undercover investigation. This is an essential starting point because it puts into context the subsequent undercover investigation, and belies the notion that Franey was prodded to act in a certain manner by the undercover agent.

### 1. Franey's Interactions with his Neighbors and Associates.

During 2015, law enforcement became increasingly concerned about Franey due to a number of disturbing contacts he had with his neighbors and associates. During these contacts – which were reported to law enforcement by concerned citizens – Franey espoused his violent and radical ideology and made efforts to acquire firearms. These contacts included:

Witness 1 reported that Franey regularly talked about his support for ISIL. According to Witness 1, Franey also consistently talked about: his desire to kill Americans; his "love for Allah" for whom he said he would gladly give up his wife and family; his desire to travel to Afghanistan to kill American soldiers; and his belief that all non-Muslim Americans should be killed in the homeland. According to Witness 1, Franey had repeatedly tried to convince Witness 1 to sell Franey a gun (even though Franey admitted he was not lawfully permitted to possess firearms). Franey was particularly interested in obtaining Witness 1's AK-47. Witness 1 refused to sell the firearm to Franey. Ex. 1 at 5-6.

On one particular occasion in April 2015, Franey was at Witness 1's house and began talking about ISIL in an aggressive and hostile manner. Franey stated that if Witness 1 was not with ISIL then he/she was against them and would be killed. Franey claimed that Americans go overseas and rape and kill women, and Franey again talked about wanting to kill Americans. Franey told Witness 1 that he/she should fly an ISIL flag at their house, and became increasingly agitated and clenched his fists. Witness 1 told Franey to leave his house, but Franey instead moved towards Witness 1. Witness 1 went inside his house, grabbed his shotgun, and ordered Franey to leave. Franey did not

SENTENCING MEMORANDUM - 4
*United States v. Franey*, CR16-5073RBL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

leave the area until Witness 1 called the police.  Another witness was also present for this incident, and corroborated Witness 1's account.  Ex. 1 at 5-6.

Several other individuals familiar with Franey gave similar accounts.

- Witness 2 reported that Franey regularly espoused radical rhetoric and has stated that he "needs to go kill Marines because they are raping women and killing them."  Ex. 1 at 5.

- Witness 3 reported that Franey has talked about "women and children being raped and brothers being murdered."  According to Witness 3, Franey further stated that the U.S. and Iranian governments were corrupt and that he would have no hesitation "taking out cops" if they interfered with him.  Franey became increasingly agitated during this conversation with Witness 3 and occasionally spoke in what sounded like Arabic phrases.  According to Witness 3, at one point Franey clenched his fists and stated, "I just wish I could get over there [Syria and Iraq].  I would kill everyone."  Ex. 1 at 5.

- Witness 4 reported that Franey asked if he/she was interested in becoming an "ISIS warrior."  Franey said "things were going to happen" soon.  Franey further told Witness 4 that "we" were going to "be cutting cops' heads off" and there was "going to be anarchy." Franey further stated that he did not care if he had to sacrifice his life to make things happen.  Franey also asked Witness 4 whether he/she had any weapons and wanted to know what type.  Franey told Witness 4 that the "ISIS movement" was going to be taking over and that Witness 4 could have Franey's residence if he "didn't make it."  Ex. 1 at 5.

- Another associate of Franey's has told the FBI that Franey regularly talked about hating the U.S. Army for not letting him "leave the Army" after he enlisted, and that Franey blames the U.S. government for "taking away his kids."  According to this individual, Franey regularly espouses his adamant support for ISIL and the Taliban, and talks about his desire to travel to Iraq to join ISIL.  Ex. 1 at 5-6.

- On November 24, 2015, a concerned citizen in Montesano called 911 to report that Franey arrived uninvited at his/her house and said he was "checking on the house for [a] brother."  Franey also said he "wanted to make sure he [the citizen] wasn't with the feds."  Ex. 2 at 3.

- On December 2, 2015, police officers responded to a call from a complainant who reported that Franey had been pounding on the door to their residence for ten minutes and then departed, stating he would be "back during the daylight." The officers went to Franey's residence to speak with him about the incident. Franey told the officers that he had gone to the neighbor's house to spread the word of the Muslim religion. Franey further stated that the governments of the world needed to fall, and that law enforcement officers should "sit back" when they start fighting against the governments. Franey stated that if the police interceded, "it would become very messy." Franey also told the officers that he believed there would someday be "a federal stand-off at my house." Ex. 2 at 5.

- In mid-December 2015, another concerned citizen contacted the Grays Harbor County Sheriff's Department to report a suspicious incident involving Franey. The citizen was an employee at a business Franey frequented. According to the citizen, Franey visited the business and had a conversation with the owner, during which Franey was expressing his "typical jihadist, extremist" beliefs. Franey also told the owner that he (Franey) would be changing his name soon, and that "when Islam activates a person" they then have to change their name. Ex. 2 at 5.

### 2. Franey's Suspicious Visit to the Satsop Nuclear Power Plant.

On December 1, 2015, Franey and one of his radical associates[1] went to the Satsop Nuclear Power Plant and had contact with an employee, who regarded the incident as suspicious and reported it to local law enforcement authorities. The Satsop Nuclear Power Plant is located near Franey's home. The plant has two large cooling towers that were designed to house nuclear operations, but the plant was never completed and the towers are non-functional. During the afternoon of December 1, 2015, the employee observed Franey's vehicle driving slowly through one of the facility's parking lots. The vehicle eventually drove towards the employee and Franey and his associate exited the vehicle. Franey asked the employee if there were any restaurants at the facility, to which

---

1 This associate is known to the FBI. He participated in several meetings with Franey and UC1 during which he expressed pro-ISIL, jihadist, extremist rhetoric.

SENTENCING MEMORANDUM - 6
*United States v. Franey*, CR16-5073RBL

1   the employee said there were none.  Franey asked if the employee knew anything about a

2   plastics facility at the plant, and the employee told him there was a nearby mill that made

3   siding out of recycled plastic and woods chips.  Franey then asked whether the cooling

4   towers were operational, and the employee stated they were not.  Franey also asked

5   whether the facility made power, and the employee answered it did not.  Franey then

6   thanked the employee for his time, and then departed the area.  Ex. 2 at 4-5.

### 3.   *Franey's Independent Efforts to Acquire Firearms.*

8          In addition to soliciting firearms from some of his neighbors and associates

9   (*i.e.*, from Witness 1 and Witness 4), Franey also made other independent efforts to find

10  firearms.  For example, on both December 1 and 2, 2015, FBI surveillance agents

11  observed Franey and his above-referenced radical associate looking at firearms-related

12  items at a hardware store in Aberdeen, Washington.  On December 1st, Franey and his

13  associate went to the hardware store and viewed airsoft pistols/rifles and firearm

14  ammunition.  Franey made an unrelated purchase on his way out of the store.  The next

15  day, Franey and his associate went back to the same hardware store and viewed firearm

16  ammunition and rifle scopes.  Ex. 2 at 5.

17         In addition, between December 31, 2015, and January 3, 2016, Franey exchanged

18  several text messages with another radical associate (another person known to the FBI)

19  discussing his desire to acquire firearms.  Using the code word "tools" for firearms (a

20  code Franey also used with UC1), Franey told his associate that he was looking for "tools

21  and [acc]eptance."  Exhibit 3 (text messages) at 1.  The associate replied that they sell

22  "tools" at Big 5 stores, and suggested that when Franey next visited him in Oregon they

23  should go to "[B]ig 5 to look at tools."  Ex. 3 at 1-2.  They continued discussing firearms

24  over the next few days.  Ex. 3 at 2-3.

### 4.   *Franey's Phone Calls with Radical Associates*.

26         During numerous intercepted telephone calls, Franey discussed his extremist

27  ideology and his desire to commit violent acts against law enforcement and others in the

28  United States.  As will be discussed below, Franey made countless similar comments to

SENTENCING MEMORANDUM - 7
*United States v. Franey*, CR16-5073RBL

UC1, but these recorded telephone calls confirm that during his private and independent communications, Franey similarly discussed his ISIL-fueled radical ideology and his desire to kill.  Summaries of a representative sample of these conversations are attached as Exhibit 4, including the following:

On January 28, 2016, Franey told one of his aforementioned associates (*see infra* footnote 1): "Yeah, get out of here or fight, man.  That's the options."  Franey described a run-in he had with someone who was wearing a green hat with an Irish flag on it.  Franey accused the man of killing Muslims, and said he tried to "fight the guy."  Franey said he "wanted to kill that guy so bad" and that he "had his knife in his hand and wanted to kill that guy."  Franey told his associate that the Islamic State did not advocate "laying low." He further stated: "I know for a fact that them brothers, if they were here, they'd be looking for every pig, and every agent, and every government building and they'd be takin' 'em down, man.  I'm not saying that we gotta do that.  All I'm saying is that yeah, the reality is that if that's who we are, that's what we gotta do."  Franey further stated, "There are good targets out there, because the police and feds are already out there with check points."  Later in the conversation, the associate said one of his family members sympathized when Marines are killed in battle.  Franey replied: "When I hear about Marines dying, my heart does a happy dance."  Ex. 4 at 1-3.

On January 29, 2016, Franey told the same associate that no one should ever say anything bad about ISIL, commenting, "They are the best."  Ex. 4 at 4-5.  During a subsequent call that same day, Franey stated that he "is ready to kill the people that he is ready to kill."  Franey said he was "ready to fight" and "there are plenty of pigs, cops, agents, judges, and others to go around. . . .  We could kill day and night and day and night and there would still be plenty."  Franey also referenced a specific Jewish man who runs a firearms store, and said he wanted to kill him for selling guns to the *kafirs* (non-Muslims).  Ex. 4 at 6-7.

//

//

## B. Facts Related to the Undercover Investigation.

### 1. Overview of the Undercover Operation.

In light of Franey's increasingly erratic behavior in the community and his consistent radical, violent rhetoric, the FBI deemed it necessary to institute an extensive undercover operation for the purpose of further investigating Franey. The operation utilized one primary undercover officer (UC1) who contacted and ultimately befriended Franey. UC1 posed as an individual who was raised as a Christian but who was open to learning more about Islam from Franey. Over time, UC1 revealed to Franey that he (UC1) was an unlawful black market seller of firearms, although this was not known to Franey at the outset of his contacts with UC1. Franey ultimately joined UC1 on five staged firearms trafficking delivery trips. Franey acted as a lookout during these trips, and also personally handled firearms on multiple occasions. From time to time, other undercover officers participated in meetings with Franey, posing as UC1's right-wing militia customers who purchased the firearms.

The facts concerning Franey's participation in the supposed firearms trafficking activities and his personal handling of the firearms are summarized extensively throughout the Complaint (Exhibit 1) and are also discussed at length in the Statement of Facts section of the Plea Agreement and in the Presentence Report (¶¶ 6-15). The government will not reiterate those same matters here. However, we wish to highlight three particular aspects of Franey's contacts with the undercover agents: (a) Franey's desperation to obtain firearms for himself and his stated intention to use them to kill law enforcement and military officers; (b) Franey's repeated discussion of his pro-ISIL, radical, violent ideology; and (c) Franey's proposal to attack a military installation in Pacific Beach, Washington.

### 2. Franey's Desire to Obtain Firearms from UC1.

Throughout the undercover investigation, Franey made clear that his primary motivation in maintaining a relationship with UC1 was his desire to acquire his own firearms, including powerful assault rifles and machineguns. Franey repeatedly

1    explained what he wanted to do with those firearms – he wanted to kill law enforcement

2    and military officers and attack a military facility near his home.

3        The affidavits attached as Exhibits 1 and 2 contain countless instances when

4    Franey asked to purchase firearms from UC1.  For a long time, UC1 put-off Franey by

5    stating that he did not yet trust Franey well enough to sell him guns.  Nonetheless, Franey

6    persisted in requesting (and eventually demanding) firearms during all of their meetings

7    and phone conversations.  A few examples are:

8
9
10
11
12
13
14
15

- At the outset of the first delivery trip to Spokane on August 3, 2015 – and even before UC1 revealed to Franey what types of items he was delivering – Franey told UC1 that he "fantasized" UC1 was a "small arms dealer" because "we need some small arms."  Franey told UC1 multiple times that he wanted a gun to kill any "police or soldiers" that came to his house "with guns drawn and tried to separate me from my family."  Franey specifically requested "a Street Sweeper semi-automatic shotgun" or another type of assault rifle.  Franey said, "[If] I had it sitting in my room, a nice AK-47 . . . I know at least that first goon squad [police] would be put to task.  And they wouldn't even suspect it because if I ever do get a gun, there'd be – through a source like you.  So no one would even know I have it, right?"  Ex. 1 at 9-12.

16
17
18
19
20
21

- During their next trip to Spokane on September 1, 2015, Franey continued to repeatedly ask UC1 for a gun.  For example, he said UC1 was "who I need to know."  UC1 asked, "Why do you need to know me?"  Franey replied, "How else am I going to get guns?"  Franey later said, "The reality is I want one for my house . . . If I'm home next time and ten cops come with their shotguns drawn, they're either going to kill me or they're going to disable me and take my children."  Franey again asked for a "Street Sweeper shotgun" or "more of a sniper type gun."  Ex. 1 at 15-16.

22
23
24
25
26

- During the trip to Ellensburg on September 28, 2015, Franey continuously requested that UC1 sell him a gun, again explaining why he wanted one: "The time when I, if I ever get these tools, that's when things get serious, because I don't care if the cops come to my house now, what are they gonna do?  Now if I have guns, then the fight's gonna have to happen. . . . Once I have guns, that's the only option. . .  I'm gonna have one chambered, and as soon as I can see one . . ." Ex. 1 at 20.

27
28

- On November 27, 2015, after the police responded to a disturbance at Franey's residence, he called UC1 and demanded a firearm: "Look dude, if you think I'm gonna trust you ever again, you better put something in my hands, and I'm talking – I don't care if it's a handgun, a shotgun, whatever.  Man, this is my family. . . .  I'm letting you know this is the condition, right here, bro."   Franey later ranted about "pig feds" and stated, "And you know what, I don't know when it's gonna happen, but one of these stupid idiots is gonna walk up to me on the wrong fucking day.  This goes for anyone.  Either in the mosque, outside of the mosque.  Uniformed or ununiformed."  Ex. 2 at 3-4.

By late January 2016, Franey's persistent demands for firearms pushed the issue to the breaking point.  On January 28, 2016, Franey told UC1: "I don't have nothing in my hands.  I don't have nothing in my hands.  And I told you a long time ago, I told you months ago . . .  'You better put something in my hands, or I will not be cool with you.'"  Franey later stated, "I have money now, man. . . .  The reality is, you know, it's 'go time,' man.  I mean, for me."  At that point, UC1 told Franey that he no longer had any qualms about selling him firearms.  The next day, on January 29, 2016, they reached an agreement for Franey to purchase an AR-15 assault rifle, a Street Sweeper shotgun, and magazines and ammunition for both firearms, in exchange for $1,900 cash.  They agreed that UC1 would deliver the firearms to Franey within four or five days.  Ex. 2 at 12-14.

After parting ways with UC1 on January 29, 2016, Franey began driving home with his wife in the car.  A subsequent search of his wife's cell phone shows that the following Google search was made on her phone at that time: "how much is 1000 rounds of .223 ambition [sic] cost."  Shortly thereafter, the phone was used to visit www.bulkamm.com and viewed the page entitled: "1000 Rounds of Bulk .223 Ammo by PMC."  Exhibit 5 at 2 (Cellebrite extraction of cell phone).  The .223 ammunition would have been compatible with the firearms Franey had arranged to purchase from UC1.

A short time later, while still en route to his home, Franey's vehicle was pulled over in a random traffic stop by a local police officer because it had an expired registration.  During the traffic stop and immediately thereafter, Franey placed three

SENTENCING MEMORANDUM - 11
*United States v. Franey*, CR16-5073RBL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

phone calls to UC1.  Franey expressed extreme anger over getting pulled over by the police and also expressed veiled suspicion directed towards UC1 that the traffic stop had occurred.  Ex. 2 at 14.  The next day, Franey sent UC1 text messages cancelling his firearms order claiming that he didn't have enough money to pay for the guns.  At the same time, Franey encouraged UC1 to "donate" the firearms to him as "charity."  *Id.*  It is unclear whether Franey cancelled his firearms purchase because he became suspicious of UC1 or because he truly didn't have the funds at that time, or both.

### 3.  Franey's Discussion of his Radical and Violent Ideology.

Franey's own statements make clear that his devotion to ISIL's radical, jihadist ideology is what motivated him to seek out firearms and what inspired him to want to kill police and military officers.  During his extensive conversations with UC1, this was the topic Franey discussed nearly constantly.  Exhibits 1 and 2 contain countless examples of Franey's articulation of his radical mindset and beliefs, and a few are highlighted here:

- Within minutes of being introduced to UC1 for the first time, Franey extolled the virtues of ISIL, describing them as "the best people on earth" and stating, "[A]nyone comes at us and they're against the Islamic State, ended up like the people you see on the videos with their head on the ground."  Regarding Osama Bin Laden, Franey opined: "Bin Laden is a diamond.  He's a holy warrior.  He's a beautiful man."  Ex. 1 at 7-8.

- Franey praised other terrorist leaders, including Anwar Al-Awlaki, the former leader of Al-Qaeda in the Arabian Peninsula ("AQAP").  Ex. 1 at 14.  He also praised various ISIL-inspired "lone wolf" terrorist attacks including the July 2015 attack against military installations in Chattanooga, Tennessee, resulting in the deaths of five U.S. service members and injuring others (Ex. 1 at 14); the December 2015 attack in San Bernadino, California, resulting in 14 people dead and 22 seriously injured (Ex. 2 at 6); and the Paris terrorist attacks, as to which Franey stated the victims were not "innocent" because they were "of age people" who were partying in Paris and their country killed Muslims, so "their thoughts were not with the Muslims."  Ex. 2 at 7.

- Franey consistently discussed his desire to kill law enforcement officers in the name of ISIL.  For example, Franey stated: "Any government agents

that I'm around, I feel the duty to kill. . . .  It's just not possible for me to have any kind of non-murderous relationship with these people." Ex. 1 at 23.  Franey later stated: "We're the least respected terrorist cell.  But honestly, we're the scariest one because we speak the truth and we're ready to fight. . . .  I don't know any other way to say it.  I'm speaking in plain English.  If you guys know anyone that's a man, who loves God, if you know anyone who wants to become a Muslim and kill some people. . . .  This is not gonna end any other way." Ex. 2 at 7.

- In addition to justifying the killing of police officers and military personnel in the name of ISIL, Franey also repeatedly discussed his desire to kill "a few judges . . . a few politicians and D.A.s. . ." Ex. 1 at 21.  *See also* Ex. 2 at 6 (referring to a judge who presided over a family law matter involving Franey by stating, "That judge the other day, I could have cut his head off.  But I don't want to just cut one judge's head off. . . .  I want to cut a lot of judges' heads off.").

- On October 28, 2015, during a delivery trip to California, Franey said he would be open to finding a "non-violent resolution," but then questioned, "What would that even be?"  Franey further stated: "I don't want to kill people.  I hope I don't come off like someone that just wants to kill people." UC1 replied, "No, you don't . . .  But to me it sounds like you're going to [commit a violent act] at some point, dude."  Franey replied, "What's the other resolution?"  Franey further stated, "It would be absurd to think I wasn't going to do something eventually. . . .  But it doesn't matter, I mean, if they take me out or anyone out, it's not gonna change the outcome. . . .  But, I wanna be in on that, if I can." Ex. 1 at 24-25.

- Similarly, on November 12, 2015, in the context of discussing his support of ISIL and other radical causes, Franey told UC1: "I don't think anyone wants to kill people . . . but the reality of what has to happen is in front of us."  Franey explained: "I've been at this point for a long time. . . .  I just don't know what I would be waiting for at this point."  Ex. 1 at 29.

### *4.  Franey's Proposal to Attack a Military Facility in Pacific Beach.*

Throughout his conversations with UC1, Franey consistently talked about his general desire to attack some sort of U.S. military target.  For example, Franey made multiple references to wanting to attack Joint Base Lewis-McChord.  *See* Ex. 1 at 17 (stating that he could "get maps" and they are not "ready for a battle . . . these guys

SENTENCING MEMORANDUM - 13
*United States v. Franey*, CR16-5073RBL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

here."); Exhibit 1 at 15 (regarding attacking JBLM: "But with a couple of tools [guns], you'd be very effective.  You'd be surprised how effective you'd be against these people, man. . . .  And when you pull the trigger, your objective is to drop somebody.  I mean, that's the reality. . .").  Franey also discussed wanting to attack military units readying to "ship out."  Ex. 1 at 15 ("I think if there's a unit, you know, from the Marines and the Army getting ready to ship out, they should be hit. . . .  And like I told you, if there was a Marine unit fixing to go out, I would hit them. . . .  Of course I would love to go hit a Marine unit before they went.").

On December 3, 2015, Franey for the first time proposed a potential attack against a specific military facility located in Pacific Beach, Washington.[2]  Franey brought this topic up on his own, and asked if UC1 would participate.  Franey initially described his proposal as an attack on an upcoming military gathering:

> There's a few spots around here, too, that wouldn't be bad to hit, you know.  They put the generals and colonels up a few weeks out of the summer at this place north of Ocean Shores, this big resort. . . .  They rent out this huge resort for all these colonels and generals to come party at. . . .  We could kill them all.   Ex. 2 at 8.

UC1 replied, "That sounds better than a base, to me."  Franey replied, "A lot easier. . . . There's a lot of options."  Later in the conversation, Franey stated, "If we wanna hit that, it'd be a summertime deal. . . .  There is some preparing to do, right? . . .  But, I mean, I wouldn't mind if we didn't let another summer go by where that officer meeting got jacked up. . ."  Franey later commented, "You and me could deal with them, with guns. It's a bunch of colonels getting drunk.  No guns, no guards. . . . These are the people making the decisions.  Highly effective.  Highly effective."  Ex. 2 at 8.

During their next conversation, on December 5, 2015, Franey again discussed the military facility, and made comments suggesting he had done some preliminary research

---

[2] This facility has a campground, RV park, and other facilities that are accessible only to active military members, reservists, retirees, and people otherwise associated with the military.

and reconnaissance.  When asked by UC1 exactly where the military retreat was located, Franey replied:

> It's not far from here.  And it's – they've only got one road, main road, which is the coast road.  Not very heavily travelled and easily shut off.  . . . They'd be nothing dude.  I mean, ten guys or something.  Literally, right?  I mean, it'd be easy, right?  A bunch of generals and captains, even if it's only a couple dozen, that's worth it.  . . .  We find out when this party is.  I mean, we don't need a lot of guys for this.  We can go in and out if we wanted.  . . . It's exciting.  I've been waiting on this forever, man. . . . I mean, it is time to hit 'em.  And the brothers – there's strategies of war, and one of 'em is, you know, hit 'em and hit 'em and hit 'em . . .

Ex. 2 at 9.

On December 19, 2015, Franey continued to discuss the idea of attacking the military retreat.  When UC1 expressed an interest in participating in the plot, Franey commented, "It has to be done.  Someone has to do it.  It's something that without a doubt would be pleasing to god.  If you did it, would be pleasing to god.  There's no doubt about this."  When asked by UC1 when this attack would take place, Franey stated, "I'm trying to find the date.  I'm trying to find the best date [when the annual gathering occurred], you know what I mean?  . . .  I'm trying to find the best date, all right?"  Franey was arrested before his proposed attack went any further.[3]

**IV.   Sentencing Recommendation.**

All of the statutory sentencing factors support a custodial sentence of 120 months in this case – the history and characteristics of the defendant; the nature and

---

3 After Franey was arrested, two of his like-minded radical associates were interviewed by FBI Special Agents.  They both admitted that Franey regularly discussed with them his desire to commit an attack on law enforcement and military personnel, and that Franey specifically proposed attacking a "military fort."  According to both of these individuals, Franey was recruiting them to participate in an attack and regularly discussed acquiring firearms with them. Both individuals stated that Franey had not yet identified for them a specific target or timeline for an attack.  These individuals were much younger than Franey and have mental health and/or social/emotional issues that made them particularly susceptible to Franey's influence.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

circumstances of the offense; the need to protect the public from further crimes of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; and the need to provide adequate specific and general deterrence.

## A. Franey's History and Characteristics.

As noted at the outset of this Memorandum, Franey's history and characteristics present a volatile combination of traits that together raise serious concerns about his future dangerousness.

### 1. Desertion from the U.S. Army and Harboring of Resentment.

According to records obtained from the U.S. Army, Franey began serving in the Army in approximately October 2002.  Franey served as, among other things, a Patriot Missile Launching Station Enhanced Operator and Maintainer, and was stationed at Air Defense Artilleries in Texas and Korea.  While with the Army, Franey received training and experience using a variety of firearms, including assault rifles and machineguns.  Franey deserted the Army in or about 2004.[4]  Ex. 1 at 4.  Franey remains disgruntled about his time in the Army and he continues to harbor great resentment towards the Army and the U.S. military in general.  For example, an associate of Franey's has reported that Franey regularly talks about hating the U.S. Army for not letting him "leave the Army" after he enlisted, and he blames the U.S. government for "taking away his kids."  Ex. 1 at 6-7.  Similarly, Franey told UC1 on numerous occasions that he blamed the Army for taking away his family.

//

//

---

[4] After his arrest in this case, the Army at JBLM filed Desertion charges against Franey.  Franey has agreed not to challenge the Desertion charge, in exchange for the Army's agreement not to seek any jail time.  This agreement was made as part of a global resolution of the Army's charges and the charges in the instant case.  The maximum punishment for Desertion is life in prison.

SENTENCING MEMORANDUM - 16
*United States v. Franey*, CR16-5073RBL

### 2. *Franey's History of Mental Illness.*

Franey has been diagnosed as bi-polar and has been involuntarily committed to a mental institution.  PSR ¶ 55.  The Probation Office describes Franey's mental health issues as "serious" and points out that they have been "untreated for several years."  PSR Sentencing Recommendation at 3.  This Court is well aware of the dangers associated with the combination of serious mental health issues and an obsession with acquiring firearms.

### 3. *Franey's History of Domestic Violence.*

Perhaps related to – or stemming from – Franey's mental health issues, Franey also has a long history of committing serious domestic violence related crimes.  In 2006, Franey was convicted of Assault 4th Degree and Harassment 2nd Degree, related to Franey's physical abuse of his former wife and their 18-month old son.  PSR ¶¶ 32.  The wife fled to an emergency shelter and called the police.  The responding officers documented large bruises on the infant, and the wife reported that Franey had pushed her down and choked her when she attempted to stop him from "spanking" the child.  *Id.*  After committing these crimes, Franey continued to violate court orders by repeatedly contacting and attempting to contact the victims, and as a result he was convicted of Criminal Trespass 2nd Degree and Making a False Report.  PSR ¶¶ 33-34, 39.

In August 2011, Franey was again arrested for domestic violence after his ex-wife called 911 and reported that Franey had held a knife above her head, pulled her down by the arm, and pinned her to the floor – all while she was eight months pregnant.  PSR ¶ 40.  As is often the case, however, there were no other witnesses to this incident and no charges were filed.  *Id.*[5]

//

---

5 FBI Agents recently interviewed the ex-wife about her relationship with Franey.  She confirmed a long pattern of physical abuse she suffered at Franey's hands.  According to her, the incidents described in the Presentence Report are only a small representative sample of the domestic violence Franey committed against her.

SENTENCING MEMORANDUM - 17
*United States v. Franey*, CR16-5073RBL

### 4. Franey Has Not Changed or Disavowed his Radical Ideology.

Franey's radical and violent mindset has been unaffected by his arrest and imprisonment in this case.  On the eve of sentencing – the very time when Franey should be most remorseful for his conduct and disavowing his radical rhetoric – he is doing the exact opposite.  In a letter he sent from the FDC SeaTac to his wife on September 30, 2016, Franey makes clear he still harbors the same radical ideologies that inspired him to seek out firearms and want to kill police and military officers.  The letter contained the following excerpts:

> The FBI pukes will still be little flaming coward faggot losers cuz regardless of how they gang up on people and oppress them and use the governments resources to spy on them and to try to make themselves look good they can't escape what they are – useless mother fuckers.

> Girl, lots of people are suffering and have suffered unimaginable hardships, horrors might be a better word. F--- these American mother f----ers these fucking Halloween candy eating, Christmas present opening FBI faggots, little kids who act like their doing something to save the world.  All the while letting and helping their government and others all over the world commit mass murder and rape, genocide, these pieces of shit who's only job is to shoot-shutdown, imprison or kill anyone that brings attention to what they are doing or tries to do something about it.

> Hey FBI losers, kill yourself, cunts. . . .  I know Allah is the most merciful but I hope these fucks never get out of Hellfire.

Exhibit 6 (BOP report summarizing letter).

It is interesting to compare this FDC letter to a handwritten letter found in Franey's residence at the time of his arrest in early February 2016.  That letter read as follows:

> Dear stupid motherfucking *minafig* Muslims and Federal Agents.  I hope to Allah *azza wa jall* that you die in your rage, that you die having sexual relations with your mamma's dead corpses you useless fucking loser, you stupid fucking fucks.  If you have any questions you can visit me at my home you useless piles of shit.  Enjoy hell. . . .  FUCK YOU BITCHES. Die in your rage, you fucks.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1  Exhibit 7 (handwritten letter).

2       Looking at these two letters together – one written prior to Franey's arrest and the

3  other from his jail cell as he awaits sentencing in this case – it is easy to see that Franey's

4  outlook on life and his radical mindset have not changed at all.  And there is no reason to

5  expect change moving forward.[6]

6      **B.  The Nature and Circumstances and Seriousness of the Offense.**

7       Franey's offense conduct was serious for several reasons.  On the surface, it is

8  concerning that a person prohibited from possessing firearms would so eagerly agree to

9  assist in what he believed was a large-scale firearms trafficking operation.  Franey spent

10  numerous days and took five overnight trips serving as a courier and lookout furthering

11  the supposed firearms trafficking activities.  Franey was under the belief that he was

12  aiding UC1 in selling high-powered firearms (including machineguns and assault rifles)

13  to right-wing militia groups.  This is a more aggravated offense than the standard felon-

14  in-possession case, where a defendant may have a gun in his car or home, but is not

15  himself selling dangerous weapons to dangerous people.  Moreover, the motivations

16  behind Franey's participation in the firearms trafficking activities makes his offense

17  conduct extremely concerning.  Franey repeatedly stated in his own words why he was

18  assisting UC1 – Franey saw UC1 as a likely source for the high-powered weapons he was

19  attempting to acquire to use against law enforcement and/or military personnel.  Given

20  Franey's motivations, this offense is about as serious as it gets.

21

22

23  6 Franey also spewed his radical, jihadist views in several other letters he sent from prison.

24  *See* Exhibit 8 (collection of letters).  For example, on April 14, 2016, Franey again went on an
    expletive-filled tirade, likening FBI agents to "F---- Nazis."  On August 5, 2016, Franey wrote a

25  letter to a sibling praising Osama Bin Laden and Anwar Al-Awlaki, stating that their lectures
    "smash my heart into a million pieces."  He further described these terrorist leaders as "not

26  Christmas celebrating, Halloween celebrating, Thanksgiving turkey eating men – these were men
    that live their life in fear and love of Allah."  In the same letter, Franey stated, "Fuck the Feds,

27  screw the government – screw the government, screw 'em."  On September 22, 2016, Franey
    wrote his wife a letter in which he described the court proceedings in the instant case as "kind of

28  stupid ridiculous and the judge and D.A. know it."

SENTENCING MEMORANDUM - 19
*United States v. Franey*, CR16-5073RBL

### C. The Need to Protect the Public from Franey's Future Dangerousness.

After spending the last few years attempting to acquire high-powered firearms from a variety of sources and repeatedly stating what he intended to do with them, Franey now wants this Court to believe he was "all talk and no action." To reach this conclusion, the Court would have to set aside common sense and ignore the substantial evidence to the contrary.

Franey is not someone who said a few angry words in the "heat of the moment" that he now regrets. Rather, Franey constantly espoused his jihadist ideology and talked about his desire to kill police and military officers to nearly everyone with whom he came into contact – including neighbors, friends, associates, his spouse, co-workers, extended family members, and even police officers who responded to disturbances he caused. Franey's contacts with these people in his everyday private life were nearly identical to the conversations he was having with the undercover agent. This simply is who Franey is at his core. Even a year in federal prison has not changed this.

Most tellingly, Franey did more than just talk about his intentions to kill in the name of ISIL. He tried to buy high-powered assault rifles and machineguns from UC1; he conducted internet searches pricing out 1,000 rounds of assault rifle ammunition; he tried to purchase an AK-47 assault rifle from Witness 1; he tried to acquire guns from Witness 4; he sent text messages to his associates discussing acquiring firearms; and he went to gun stores on multiple occasions. Franey identified a local military facility for a proposed attack, appears to have done some preliminary reconnaissance regarding the facility's physical layout, and discussed his proposed attack with UC1 and at least two of his radical associates. He also visited a nuclear power plant with one of his radical associates under suspicious circumstances.

//
//
//
//

SENTENCING MEMORANDUM - 20
*United States v. Franey*, CR16-5073RBL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Based on the facts developed during this investigation, the Court has every reason

2  to credit Franey's own statements about his intentions.  He simply is not entitled to the

3  benefit of the doubt at this point.  Perhaps Franey said it best himself when he told UC1:

4    ***"It would be absurd to think I wasn't going to do something eventually."***

5  Ex. 1 at 24-25.

6  **V.    Conclusion.**

7    For all of the reasons set forth above, the government recommends that the Court

8  sentence the defendant to a term of imprisonment of 120 months and a term of supervised

9  release of three years, with all of the conditions of supervised release recommended by

10  the Probation Office.

11    DATED this 13th day of January, 2017.

12
                                          Respectfully submitted,
13
                                          ANNETTE L. HAYES
14                                        United States Attorney

15
                                            /s Todd Greenberg
16                                        TODD GREENBERG
17                                        Assistant United States Attorney
                                          United States Attorney's Office
18                                        700 Stewart Street, Suite 5220
19                                        Seattle, Washington 98101-3903
                                          Facsimile: 206-553-4440
20                                        Phone: 206-553-2636
21                                        E-mail: Todd.Greenberg4@usdoj.gov

22

23

24

25

26

27

28

SENTENCING MEMORANDUM - 21
*United States v. Franey*, CR16-5073RBL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## CERTIFICATE OF SERVICE

2

3        I hereby certify that on January 13th, 2017, I electronically filed the foregoing

4   with the Clerk of Court using the CM/ECF system which will send notification of such

5   filing to the attorney of record for the defendant.

6

7

8                                          *s/Jenny Fingles*
                                           JENNY FINGLES
9                                          Legal Assistant
                                           United States Attorney's Office
10                                         700 Stewart, Suite 5220
                                           Seattle, Washington 98101-1271
11                                         Phone:  206-553-7970
                                           E-mail: jenny.fingles@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SENTENCING MEMORANDUM - 22
*United States v. Franey*, CR16-5073RBL