JUDGE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 16-5073 RBL |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S SENTENCING |
| v. | ) | MEMORANDUM |
| | ) | |
| DANIEL SETH FRANEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. STATUS OF CASE

On February 6, 2016, Daniel Franey was arrested on a Complaint charging him with five counts of Unlawful Possession of Firearms. He was detained and has remained in custody since that date. Following indictment on five counts of Unlawful Possession of Firearms, Mr. Franey pled guilty to Count 5, Unlawful Possession of Machineguns. Sentencing is currently scheduled for January 20, 2016, before the Honorable Judge Leighton.

## II. SENTENCING RECOMMENDATION

Mr. Franey respectfully requests that the court impose a sentence of 18 months, as recommended by Probation, followed by a three year term of supervised release. Such a sentence takes into full consideration the unique facts of this case, as well as Mr. Franey's personal history and characteristics, and is substantively reasonable under Ninth Circuit law. It will also allow Mr. Franey to be reunited with his family and provide for their support, as he has done in the past.

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

## A.    Presentence Report/Objections

The defendant has no objections to the personal information contained in the presentence report.  The advisory guideline calculations are technically correct, as they are based on Mr. Franey's momentary possession of five machineguns, which provide for a base offense level of 20, and a two level upward adjustment for the number of weapons, and a three level reduction for acceptance of responsibility.  Had the government's undercover operation focused on firearms other than machine guns, Mr. Franey's base offense level would likely have been 14, resulting in a much lower sentencing range.  Depending on the number of firearms involved, his sentencing range could have been as low as 12 to 18 months.

## B.    The Court's Sentencing Authority and Duties

Although Mr. Franey is advocating for a custodial sentence, the Court should be aware that a sentence of probation may also be appropriate in this case for many reasons based on what the Supreme Court and Congress have stated about sentencing.

The sentencing guidelines might call for imprisonment in a given case but the Supreme Court under, "§ 3553(a)(3) directs the judge to consider sentences other than imprisonment."  *Gall v. United States*, 552 U.S. 38, 58-59 (2007).  The Court's direction can be traced back to two Congressional mandates.

One, §3582, which requires the court, "in determining whether to impose a term of imprisonment... [to] consider the factors set forth in section 3553(a) ... recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §3582(a).

Two, §994(j), which instructs "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 2

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. §994(j).

These two mandates apply with great force to first time felons like Mr. Franey who have not committed a violent offense. The mandates work hand in hand with the Court's objective. The Court's objective is to impose as lenient a sentence that achieves the four purposes of punishment–justice, deterrence, incapacitation, and rehabilitation. The sentence must be "sufficient, but not greater than necessary," to satisfy the purposes set out in 18 U.S.C. § 3553(a)(2). *United States v. Kimbrough,* 552 U.S. 85, 101 (2007). The "parsimony provision" is what primarily drives the Court's sentence. *Id.* It prohibits harsh sentences under the guidelines. *Id.* It prohibits harsh sentences when a successful argument has been made that the guideline sentence itself reflects an unsound judgment because it fails to properly reflect § 3553(a) provisions. *Rita v. United States*, 551 U.S. 338, 356-357 (2007).

This is why district courts "may not presume that the Guidelines range is reasonable," because the law requires courts to "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. at 49-50; see also, *Rita v. United States*, 551 U.S. at 350-351. On more than one occasion the Government has "acknowledge[d] that . . . 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.'" *United States v. Kimbrough*, 552 U.S. at 101. *See also*, *Gall v. United States*, 552 U.S. at 59 (finding a sentence outside the Guidelines to be reasonable). The Probation office also has recommended a below guideline sentence after assessing all the 18 U.S.C. § 3553 factors. Sentence Recommendation, p. 1. Under §3582(a), §994(j), *Kimbrough, Gall,* and *Rita,* these arguments and reasons clearly justify an eighteen month sentence in this case.

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 3

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

## III. DISCUSSION

### A.      Factual Background/Offense Conduct

Sometime prior to and during the spring of 2015, Mr. Franey came to the attention of both local and federal authorities.  Various witnesses claimed that Mr. Franey had voiced "radical rhetoric" about ISIS and the political situation in the Middle East.  The Federal government was concerned and shortly thereafter, the FBI began an undercover operation whose purpose was to investigate Mr. Franey and determine if indeed he posed a legitimate threat to the safety of others in the United States.

The undercover operation focused on trying to persuade Mr. Franey to purchase firearms and to assess whether or not he had any actionable plans.  One particular undercover agent was assigned to get to know Mr. Franey.  This undercover agent expressed an interest in learning about Islam and Mr. Franey, a fervent believer in Islam, spent a great deal of time and effort educating the agent about Islam, encouraging him to attend local mosques to learn more about Islam, and trying to persuade the undercover agent to convert to Islam as well.  Mr. Franey discusses Islam and attempts to convert others during almost of his conversations with those he encounters.

Ultimately, the undercover agent asked Mr. Franey to accompany him on trips to Eastern Washington and California.  Mr. Franey saw this as an opportunity to help, to earn some money, and to proselytize.  During the trip, the undercover agent ultimately revealed that he was transporting and selling firearms.  Mr. Franey expressed concern about this trip and was assured of its legality by the undercover agent.  Mr. Franey knew that he could not possess firearms.  However, he did not realize that his handling of firearms on these trips was illegal.  Had he known that federal law prohibited even his momentarily possessing firearms, he would not have gone on these trips.

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 4

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

During these trips, Mr. Franey discussed the weapons with the undercover agent, handled them, and one excursion, engaged in target shooting with agents. During these long automobile trips, Mr. Franey again engaged in long conversations about Islam and tried to educate the undercover agent about the tenets of the Islamic faith. During these trips, Mr. Franey also voiced strong personal opinions about various topics, including the political situation in the Mideast, Syria, and ISIS.

Mr. Franey received some money from the undercover agent for his participation in these trips. During this undercover operation, the FBI also paid some of their household bills, including their electric bill. The FBI also supplied Mr. Franey with several phones. This financial assistance was needed, as Mr. Franey and his family were unable to pay their household bills at the time and were also in need of necessities such as diapers for their children. Mr. Franey fishes for a living, however, this income is sporadic and does not fulfill all of their monetary needs. He had looked for other "day laborer" work in the area, but was unsuccessful. Mr. Franey's wife, Genelle, cares for their two young children, both under three years old, which limits her ability to work.

Mr. Franey is not allowed to possess firearms because of a May, 2014, restraining order from Lake County, Illinois, obtained by Amanda Kienast, the mother of four of his six children. Under federal law, possession of a firearm includes even momentary, temporary possession. This is often a difficult concept for those not versed in the law to understand. Mr. Franey was not aware that his mere handling of these firearms would result in a federal charge of illegal possession of firearms. He now fully understands the nature and extent of the federal law and realizes that he will not at any time be able to possess weapons. *See* Ex. 1, Defendant's letter of acceptance of responsibility.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

It is important to note that, despite the government's relentless efforts, they were never able to persuade Mr. Franey to actually purchase any of the firearms or take possession of them.  During their last encounter, Mr. Franey claimed to have money from fishing and still declined to purchase any firearms.  Nor were there any firearms at his house or on his property when it was searched after his arrest.  The extent of Mr. Franey's involvement in the offense was "acting as lookout on the trip[s]." PSR, Par. 10.

Beyond this offense conduct, there is no evidence of any concrete plan to utilize the firearms in any way or to advance any of Mr. Franey's verbal rhetoric.  There is simply no evidence of any planning or furtherance of any of the verbalizations made by Mr. Franey during the entire time that the undercover agent interacted with him. Certainly, the government could have devised a more detailed "attack" plan based on his rhetoric and encouraged Mr. Franey to participate.  This would have resulted in more catastrophic criminal activity that would have given substance to his empty rhetoric.  It also would have brought about more serious charges, giving the government a much better argument for incarcerating Mr. Franey.  Indeed, the government conducted an extensive investigation into Mr. Franey's life and personal affairs, including examining his and his wife's phones, bank records, social media, and interactions within his community to determine if he was at all serious about his rhetoric.  Nothing they found verified any criminal activity beyond the current charges. To suggest otherwise, now, flies in the face of the evidence they gathered.

### B.    Personal Background and Characteristics

Mr. Franey is 34 years old and now lives outside Montesano, Washington, with his wife, Genelle, and their two small children.  They have lived there for the past three years.  Genelle cares for their children and Mr. Franey works, either fishing, when he can, tending their large organic garden, or assisting in caring for their children.  They

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 6

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

sell some of their organic produce to a local grocery store, and live simply. Both are converts to Islam and are fervent about their religion. Consistent with their faith and like other faiths, they encourage non-Muslims to become Muslims.

Mr. Franey grew up in California, the second of nine siblings. His father worked as a heavy equipment operator and his mother home-schooled all of the children. The family moved to Oregon when he was 14 and he stayed there with his family until 2001, when he went to Hawaii with one of his brothers for a few months. He graduated from high school and shortly thereafter, Mr. Franey joined the Army.

While in the Army, stationed in Korea, Mr. Franey met Amanda Kienast, who was to become the mother of his first four children. Ms. Kienast was also in the Army. In 2004, both Ms. Kienast and Mr. Franey were allowed to return to the United States for family emergencies. Neither of them returned to the Army. Mr. Franey has now resolved his desertion status with the Army, although he believed that Ms. Kienast had taken care of this for him a long time ago.

After their respective family problems were resolved, Mr. Franey, Ms. Kienast and two of Mr. Franey's brothers decided to go to Alaska. After reaching Ninilchik, Alaska, they settled there and all of them obtained work. Mr. Franey's brothers still reside in Ninilchik and Mr. Franey returns to Alaska to fish with them when he is able. While in Alaska, both Mr. Franey and Ms. Kienast worked at various jobs, including salmon canneries and in restaurants. They purchased land, built a cabin together and had their first child there. However, theirs was not an easy relationship. In November, 2006, Ms. Kienast left Alaska and Mr. Franey, and returned to Wisconsin to be near her family. Mr. Franey moved to Wisconsin as well, to be near both Ms. Kienast and their son. They were reconciled by July, 2007, shortly before their daughter was born.

In August, 2007, they moved together to Oregon, to help Mr. Franey's father with his properties and assist him in farming. Their third child was born in early June,

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 7

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

2009.  In June, 2009, Mr. Franey was under a great deal of stress, preparing for the birth of his child and assisting his father with their three farms.  Ms. Keinast and other family members were extremely concerned and reported to authorities that he was not sleeping, had delusional thoughts and ideas, and was not making any sense.  Law enforcement became involved and after an evaluation, he was civilly committed in Salem, Oregon.  He was diagnosed as bi-polar and after three months, when he appeared to be much improved, was released to his family.

Ms. Kienast moved back to Illinois with their three children while Mr. Franey was civilly committed.  After Mr. Franey was released, he returned to Alaska to live with his brothers and find work.  Ms. Kienast begged him to join her in Illinois and then paid for a plane ticket for him to join her and the children in Illinois.  This reconciliation lasted only a few weeks.  Mr. Franey then returned alone to Washington to fish with his sister and earn money to support his children.  Ms. Kienast again wanted him to return to Illinois and again paid for him to return there in February, 2010.  In April, 2010, Ms. Kienast, Mr. Franey and their three children all returned to live together in Hoquiam, Washington.  Ms. Kienast remained in Hoquiam until August, 2011, when she then left with her and Mr. Franey's children and returned to Wisconsin.  This was their final separation.  Ms, Kienast gave birth to their fourth child in October, 2011.

Mr. Franey has continued to try to have a relationship with his children in Wisconsin since Ms. Kienast returned there.  He has traveled there to visit his children and has phone contact with them as he is able.  Ms. Kienast obtained a restraining order in March, 2014 when she asserted that Mr. Franey threatened her during one of his phone calls.  The Illinois Circuit Court granted the Restraining Order and Mr. Franey was served with the same in April, 2014.

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 8

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Mr. Franey moved back to the Montesano area in 2012.  One of his sisters lives in nearby Westport and has a fishing boat.  Mr. Franey has been able to fish with her, and others, and is thus able to provide for his family.  *See* Exhibit B, letter from Grant Baldwin.   He and his wife, Genelle, were able to purchase a small house in rural Montesano and live a quiet life there.  They have a large organic garden, a small flock of sheep, and are generally self-sufficient.  Mr. Franey is a devoted father and husband and cares deeply for his children and his wife.  *See* Ex. C, letters and photos from family, friends.  He has been concerned about their welfare without him the past 11 months and realizes that his incarceration has been most difficult for them.

### C.    A Sentence of 18 Months is Sufficient to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for this Offense.

Section 3553(a)(2)(A) requires the judge to consider "the need for the sentence imposed.. . to reflect the seriousness of *the offense*, to promote respect for *the law*, and to provide just punishment *for the offense*." A sentence that is excessive in light of the seriousness of the offense promotes disrespect for law and provides unjust punishment. (Emphasis added).  "[T]he offense" in this case is possession of a firearm, a Class C Felony, which allows for probation or as little as one year of supervised release.  *Id.*

Promoting respect for this law requires punishment to reflect not only the seriousness of the offense, but also what is just. 18 U.S.C. 3553(a)(2)(A); *see also* Richard A. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*," 89 Minn. L. Rev. 571, 590 (Feb. 2005) (defining just punishment and retribution).  The respect sought here from Mr. Franey is to get him to realize that, he, knowing that the restraining order issued in Illinois prohibited him from coming into contact with guns, nevertheless came into contact with guns in the state of Washington.

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 9

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1  However, respect also demands that "Mr. Franey's conduct must not drive us to

2  forget that it is not *severe* punishment that promotes respect for the law, it is

3  *appropriate* punishment." *United States v. Olhovsky*, 562 F.3d 530, 531 (3d Cir. 2009)

4  (emphasis added).  In making the determination, the Court must view the offense in

5  context, a context that includes not only the offense itself, but also the history and

6  characteristics of the offender which is already before the Court.

7  In the present case, Mr. Franey's contact with the firearms occurred several

8  thousand miles away from where the court order was issued in Illinois.  There is no

9  evidence before the Court that Mr. Franey came into contact with the firearms for the

10  purpose of acting violently against the person who obtained the restraining order

11  against him.  The last reported contact Mr. Franey has had with that individual was five

12  years prior to he being arrested for the case.  A guideline sentence would certainly be

13  appropriate if Mr. Franey had obtained firearms or threatened the individual who

14  obtained the restraining order against him.  This is clearly not the case here.

15  Also, in the present case, it is as important to consider what Mr. Franey did NOT

16  do, as well as what he did in light of the fact that the Government, without any

17  empirical or forensic evidence, is asking the Court to conclude that he presents a danger

18  to the community.

19  First of all, Mr. Franey never purchased any firearms from the government or

20  from anyone else on any occasion.  No firearms were found in his home when it was

21  searched.  And, despite Mr. Franey's loud and vociferous rhetoric about politics,

22  religion, and the Middle East, there is no evidence that he did anything more than talk

23  freely about his opinions.  There is, for example, no evidence of him even sending

24  money overseas to support foreign organizations that espouse violence.  Certainly, there

25  is no evidence of him training, either here or overseas, with any radical organization, or

26  even making plans to do so.

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 10

No plans that Mr. Franey talked about ever came to pass.  Nothing happened to advance any of these plans.  No evidence was found that would indicate where, when or how those plans would come to fruition.

**D.    Mr. Franey Should Not Be Punished for Exercising his First Amendment Right of Free Speech**

**1.    The Government is conflating Mr. Franey's protected speech with the underlying offense.**

Beyond his illegal momentary possession of the firearms, the government is not alleging that Mr. Franey committed any other crime.  The purpose of the government's surveillance and undercover operation was to ascertain whether or not Mr. Franey's many statements about politics, ISIS, Islam and the Mideast were "true threats" or just rhetoric.

Only speech that is a "true threat" can be punished.  Under current Ninth Circuit law, a statement is only a true threat if "'the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals,'" noting that "[t]he clear import of this definition is that only *intentional* threats are criminally punishable consistently with the First Amendment." *United States v. Cassel*, 408 F.3d 622, 631 (9th Cir. 2005).  *Id.* (quoting *Virginia v. Black*, 538 U.S. 343,  359-60 (2003)); *see also United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011) ("Because the true threat requirement is imposed by the Constitution, the subjective test set forth in *Black* must be read into all threat statutes that criminalize pure speech.").  The Ninth Circuit also requires that the statement be objectively threatening. *Bagdasarian*, 652 F.3d at 1117 ("[W]ith respect to some threat statutes, we require that the purported threat meet an objective standard *in addition* [to the subjective standard], and for some we do not.").  Under that test, a statement can only be punishable if, when "considered in [its] full context," the statement "would be

interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm on or to take the life of [someone]." *Id.*, at 1119 (internal quotations and citations omitted). Thus, in order to prove that a threat was a "true threat" the Government must prove that the defendant subjectively intended the statement to be taken as a threat and also needs to prove that a reasonable listener objectively would have perceived it as a threat.

There is no evidence that Mr. Franey's speech reached the level of a legitimate or "true" threat. Individuals have been prosecuted for making threats that have violated their right to free speech.    For example, in *United States v. Jasper Bell*, CR 16-176RSL, Judge Lasnik sentenced Mr. Bell was sentenced to time served (approximately 60 days) for making a threat to kill Congressman Jim McDermott. In *United States v. Charles Wilson*, CR 10-130JCC, Judge Coughenour imposed a sentence of 12 months, one day, for threats against Senator Patty Murray. In *United States v. Charles Habermann*, CR11-029JLR, Judge Robart imposed an 8 month sentence for another individual who left threatening voicemail messages for Congressman Jim McDermott. Individuals have also been sentenced for posting threats against specific individuals on Facebook. In *United States v. Abdul-Jabbaarr*, CR 14-0358RSL, Judge Lasnik imposed a sentence of credit for time served (approx. 2 months) for threats against a police officer that Mr. Abdul-Jabbaarr had posted on Facebook in the aftermath of the killing of a young black man in Ferguson, Missouri.

### 2.    The Government's recommendation is not narrowly tailored to serve a compelling government interest.

These cases places before the Court another aspect of this case which drives the Government's sentencing recommendation. The Government's memorandum is so inextricably intertwined with Mr. Franey's political and religious views that it runs afoul of the First Amendment. The First Amendment prohibits the Government from

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 12

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

proscribing speech or expressive conduct if the Government disapproves of the ideas expressed. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992). "The rationale of the general prohibition, after all, is that content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.' *Id.* at 387. The Government's recommendation is based on its disapproval of Mr. Franey's religious and political ideology. Dkt. 39, p. 12. It asks the Court to join its recommendation by citing to two affidavits which are filled with his political and religious views. Dkt. 39, Ex. 1 and 2. It is incumbent on the Government to explain to the Court that their recommendation "is narrowly tailored to serve a compelling [Government] interest." *Id.* at 395.

> **E.     A Sentence of 18 Months and Conditions Proposed by Probation is Sufficient to Protect the Public and Deter Future Criminal Conduct**

Section 3553(a)(2)(B) requires the judge to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." Probation has rightly pointed out that the proposed sentence of 18 months is far longer that the only other sentence that Mr. Franey has served, 60 days in custody. The conditions of Mr. Franey's confinement at FDC have been particularly onerous. When Mr. Franey was arrested, he was placed in solitary confinement at FDC simply because of the nature of his criminal charges. He remained there for 9 months, although he was not a disciplinary problem and incurred no disciplinary violations. For the last few months, he has been housed in general population, again with no disciplinary problems. Part of his remaining time in custody, should the Court adopt the recommendation of Probation and the defense, will undoubtedly be spent at the local Residential Reentry Center, where he will have an opportunity to work and demonstrate, as he has already, that he can be compliant with rules imposed upon him.

DEFENDANT'S SENTENCING MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 13

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1       Probation has also proposed a three year term of supervised release, the

2 maximum term, which will provide a further opportunity for Mr. Franey to demonstrate

3 that he can comply with their requirements.  The proposed conditions are specifically

4 geared toward insuring that Mr. Franey address those issues in his life that has caused

5 him to end up before the Court.  Most important is the condition that Mr. Franey engage

6 in mental health counseling.  While at the FDC, Mr. Franey has not been receiving

7 anything but the most cursory of mental health counseling.

8       As of November 30, 2016, Mr. Franey decided to take mood-stabilizing

9 medication to control his bi-polar condition.  He is following the medication regime and

10 those around him notice a decrease in his mania and his impulsive behavior and speech.

11 The medication dose will be increased over time and reach its maximum effect.  Mr.

12 Franey intends to continue with this medication after his release.

13    **F.**    **Mr. Franey Does Not Pose a Risk of Future Dangerousness**

14       Section 3553(a)(2)(C) requires the judge to consider "the need for the sentence

15 imposed . . . to protect the public from further crimes of the defendant."  This purpose

16 has to do with both the defendant's risk of recidivism and the danger posed by the

17 defendant, if any.  It "is particularly important for those offenders whose criminal

18 histories show repeated serious violations of the law."  S. Rep. No. 98-225 at 76 (1983).

19 It is not so important for first offenders, for those who have little risk of recidivism, for

20 those whose prior offenses are relatively minor or non-violent, or for those who have a

21 strong potential for rehabilitation, perhaps through appropriate treatment they have

22 never received.  Mr. Franey is a first-time felon.  He has had the restraining order

23 prohibiting him from contact with firearms for several years.  The evidence

24 demonstrates that this is the first time he has come into contact with firearms since the

25 order was implemented.  His contact with firearms was dependent, in part, on a

26 Government campaign to investigate him.

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 14

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1        The Government claims that interviews with two individuals after Mr. Franey's

2   arrest bolster their argument that Mr. Franey continues to pose a danger.  These

3   interviews do not support this supposition.  In one of these interviews, an individual

4   named Logan Colson does talk about how Mr. Franey talked about plans to attack

5   various individuals or organizations.  It appears that the last personal conversation that

6   Mr. Franey had with Mr. Colson was in August, 2015.  However, Mr. Colson could not

7   point to even one thing that Mr. Franey had done to put these plans into action, beyond

8   his talking about them.

9        FBI agents also interviewed individuals who knew Mr. Franey but did not find

10  him threatening.  However, these interviews were not cited in the government's

11  sentencing memorandum.  Patrick Forbes, a fishing boat captain, and other deck hands

12  were interviewed after Mr. Franey's arrest.  One of the deck hands commented that Mr.

13  Franey's seemed to be "acting crazy" (although no context is given for this remark);

14  another noted that Mr. Franey's speech was one that "Franey had probably given a

15  million times before."  *See* Ex. E.

16       Another former boat captain, Grant Baldwin, writing on behalf of Mr. Franey's

17  earlier request for release to go fishing, also notes that Mr. Franey said things that

18  "weren't proper" but that no one took him seriously.  He fished regularly with them and

19  they simply ignored his rhetoric.  *See* Ex.B.

20       The encounter that Mr. Franey had with the Satsop plant employee, when

21  examined in full, is also not an indication of future dangerousness.  *See* Ex. F.  Mr.

22  Franey approached the employee directly and had a polite conversation with him.  The

23  employee did not express any danger or concern about speaking with Mr. Franey nor

24  did he express that any of Mr. Franey's questions were unusual.  Indeed, there had been

25  restaurants there in the past, the last just one year ago.  Mr. Franey asked a couple other

26  questions and then left.  The Satsop employee was interviewed by law enforcement

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 15

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

after this event, but had not independently reported his encounter with Mr. Franey as suspicious.

### G.    A Sentence of Eighteen Months Provides Mr. Franey Rehabilitation in the Most Effective Manner

Section 3553(a)(2)(D) requires the judge to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." There is substantial evidence that prison, by disrupting employment, reducing prospects of future employment, weakening family ties, and exposing less serious offenders to more serious offenders, leads to increased recidivism. *See* Lynne M. Vieraitis, Tomaslav V. Kovandzic, Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Public Policy 589 (2007).

There is also substantial evidence that community treatment programs, similar to those offered by the Probation Office, are more effective in reducing recidivism than prison treatment programs. For example, the Washington State Institute for Public Policy found that community drug treatment reduces recidivism by 9.3%, while prison drug treatment programs reduce recidivism by only 5.7%, and that treatment-oriented intensive supervision reduces recidivism by 16.7%. *See* Washington State Institute for Public Policy, *Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates*, Exh. 4 at p. 9 (October 2006), available at http://www.wsipp.wa.gov/rptfiles/06-10-1201.pdf.

Both Mr. Franey and the Probation Office have considered the impact of a lengthy prison sentence on Mr. Franey's future employment and family ties. Mr. Franey's wife is tasked with caring for two young children. Mr. Franey is primarily responsible for providing for his family through seasonal employment: fishing and construction. PSR, Par. 63-64. These jobs are given to Mr. Franey as a result of strong

DEFENDANT'S SENTENCING
MEMORANDUM
(*U.S. v. Franey*; CR 16-5073 RBL.) - 16

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

relationships he has formed in his community.  It is imperative that he return as soon as possible to his family so that he continues to provide for them.  The Guidelines, in fact, take family ties and responsibility into consideration.

Before *Booker*, U.S.S.G. § 5H1.6 allowed departures for extraordinary family ties and responsibilities.  Mr. Franey's case is extraordinary because his wife cannot work while having to also take care of two small children.

Mr. Franey's case meets all four requirements set forth in application note 1(B).  Putting him in prison has and will (1) cause a substantial, direct, and specific loss of essential caretaking and financial support to his wife and children; (2) it far exceeds the normal loss of caretaking and financial support incident to incarceration; (3) there is no effective remedial or ameliorative program which can replace his financial support as a direct result of Mr. Franey's incarceration; and (4) the departure to eighteen months will effectively address those concerns.  This provision of the guidelines has been drafted to advance the larger objective of balancing the need to imprison someone versus the need to keep a family stable.  The provision recognizes that when imprisonment disrupts the defendant's family, it has the consequence of undermining the purposes of incarceration which include rehabilitation.

//
//
//
//
//
//
//
//
//

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## IV. CONCLUSION

The 18 month sentence and the conditions and terms of supervision as proposed by Probation and joined in by defense counsel is a reasonable sentence.  It is sufficient but not more than necessary to accomplish all of the goals of sentencing as well as ensuring the safety of the community.

DATED this 17th day of January, 2017.

Respectfully submitted,

s/ *Linda Sullivan*
Assistant Federal Public Defender

s/ *Mohammad Ali Hamoudi*
Assistant Federal Public Defender
Attorneys for Daniel Franey

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on January 17, 2017, I electronically filed the foregoing

3  Defendant's Sentencing Memorandum and Exhibits with the Clerk of the Court using

4  the CM/ECF system, which will send notification of filing to all registered parties.

5
              *s/ Julie L. Valencia*
6              Paralegal
              Federal Public Defender
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26